# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| SHARITY MINISTRIES, INC.,[1] | Case No.: 21-11001 (___) |
| Debtor. | |

## SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION

**BAKER & HOSTETLER LLP**
Jorian L. Rose (*pro hac vice* pending)
Jason I. Blanchard (*pro hac vice* pending)
Elyssa S. Kates (*pro hac vice* pending)
45 Rockefeller Plaza
New York, New York 10111

Andrew V. Layden (*pro hac vice* pending)
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432

- and –

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801

Proposed Counsel for the Debtor and Debtor in Possession

---

[1] The last four digits of the Debtor's federal tax identification number is 0344. The Debtor's mailing address is 821 Atlanta Street, Suite 124, Roswell, GA 30075.

# Table of Contents

ARTICLE 1 HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR......................3

    1.1    Nature of the Debtor's Business. ..................................................................3

    1.2    History of Business Operations of the Debtor......................................................3

    1.3    Filing of the Debtor's Chapter 11 Case. ..............................................................3

    1.4    Legal Structure and Ownership.......................................................................3

    1.5    Debtor's Assets. ............................................................................................3

    1.6    Debtor's Liabilities. .......................................................................................4

    1.7    Current and Historical Financial Conditions. ...........................................4

    1.8    Events Leading to the Filing of the Bankruptcy Case. ............................4

    1.9    Significant Events During the Bankruptcy Case. ....................................5

        A.    First Days Orders. ....................................................................5

        B.    Employment of Professionals and Advisors. .................................6

        C.    Assumption or Rejection of Certain Contracts. ...........................6

        D.    Stay of Pending Litigation. .......................................................6

        E.    Claims Process and Bar Date.....................................................6

    1.10    Projected Recovery of Avoidable Transfers. ........................................6

ARTICLE 2 THE PLAN ..........................................................................................7

    2.1    Unclassified Claims. ...................................................................................7

        A.    Administrative Expenses.............................................................7

        B.    Priority Tax Claims. ..................................................................8

    2.2    Classes of Claims. ......................................................................................9

        A.    Classes of Secured Claims. .......................................................9

        B.    Classes of Priority Unsecured Claims..........................................9

        C.    Classes of General Unsecured Claims. ......................................10

      D.      No Equity Interest Holders. ...................................................................10

2.3     Member Share Requests.......................................................................11

2.4     Estimated Number and Amount of Claims Objections.........................11

2.5     Treatment of Executory Contracts and Unexpired Leases....................11

2.6     Means for Implementation of the Plan.................................................12

      A.      Continued Corporation Existence. ............................................12

      B.      Vesting of Reorganized Debtor's Assets Free and Clear...........12

      C.      Management of Reorganized Debtor...........................................12

      D.      Creation and Funding of Creditor Trust.....................................13

      E.      Preservation of Causes of Action...............................................14

      F.      Effectiveness of Securities, Instruments, and Agreements.......15

      G.      Term of Injunctions or Stays......................................................15

      H.      Option to Liquidate Reorganized Debtor....................................15

2.7     Payments. .............................................................................................15

2.8     Post-Confirmation Management. ..........................................................15

2.9     Tax Consequences of the Plan. ............................................................16

A.      Certain U.S. Federal Income Tax Consequences to holders of General Unsecured Claims. .............................................................................17

      1.      Disputed Ownership Fund Treatment.........................................18

      2.      Accrued Interest and OID...........................................................18

      3.      Market Discount.........................................................................19

      4.      Medicare Tax on Net Investment Income...................................19

2.10    Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan.....................................................................................19

ARTICLE 3 FEASIBILITY OF PLAN.................................................................20

3.1     Ability to Initially Fund Plan. ..............................................................20

3.2      Ability to Make Future Plan Payments And Operate Without Further Reorganization. ..................................................................................20

ARTICLE 4 LIQUIDATION ANALYSIS..................................................................20

ARTICLE 5 DISCHARGE........................................................................................21

5.1      Discharge. ..............................................................................................21

ARTICLE 6 GENERAL PROVISIONS ....................................................................21

6.1      Title to Assets. .......................................................................................21

6.2      Binding Effect. .......................................................................................21

6.3      Severability. ..........................................................................................22

6.4      Retention of Jurisdiction by the Bankruptcy Court. ...............................22

6.5      Captions. ...............................................................................................22

6.6      Modification of Plan. .............................................................................22

6.7      Final Decree. .........................................................................................22

6.8      Provisions Governing Distributions........................................................22

       A.      Delivery of Distributions ............................................................22

       B.      Unclaimed Distributions ............................................................23

       C.      Minimum Distributions ..............................................................23

6.9      Releases and Injunctions.........................................................................23

       A.      Injunction Related to Discharge..................................................23

       B.      Consensual Releases by Holders of Impaired Claims. ...............23

     D.      Debtor Releases......................................................................................24

       C.      Injunction Against Interference with Plan. .................................24

6.10      Exculpation. ...........................................................................................24

6.11      Revocation of Withdrawal of Plan..........................................................25

6.12      Governing Law. .....................................................................................25

6.13      Exemption from Transfer Taxes. .............................................................25

6.14    Successors and Assigns..........................................................................................25

6.15    Entire Agreement. ..............................................................................................26

ARTICLE 7 ATTACHMENTS..................................................................................................26

ARTICLE 8 FREQUENTLY ASKED QUESTIONS................................................................26

ARTICLE 9 DEFINITIONS......................................................................................................27

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

Sharity Ministries Inc. ("Sharity" or the "Debtor") is a Section 501(c)(3) faith-based nonprofit corporation that operates a Health Care Sharing Ministry ("HCSM"). Sharity's HCSM membership consists of individuals who share a common set of religious beliefs and have agreed to share medical expenses in accordance with those beliefs. Members participate voluntarily by submitting monthly contributions to assist other Members with their medical expenses. Sharity offers a variety of healthcare sharing programs that feature various participation levels, affording members different levels of sharing eligibility based on different levels of voluntary contributions Members may choose to make.

Prior to bankruptcy, Sharity commenced a strategic process by which it (a) solicited third party interest to enter into agreements to provide administrative, technological, and other services to Sharity, and (b) analyzed its operational footprint to determine the locations in which could most effectively operate (the "Strategic Process"). The goal of the Strategic Process was to maximize the efficiency of Sharity's operations, such that a greater percentage of each dollar shared by a member would ultimately be used to assist other Members with their medical expenses.

As a result of the Strategic Process, Sharity identified certain third-party service providers that Sharity believes can provide a high-quality level of service that Sharity and its Members expect at more competitive prices than its current vendors, and decided to reduce the number of states in which it operates. Absent a bankruptcy filing, Sharity does not have the ability to terminate many of its existing service contracts without multi-year termination periods. Sharity filed this bankruptcy case to facilitate the transition to its new service providers and right-size its operations in an orderly and efficient manner that minimizes any disruption to its Members, all while (i) continuing to operate as a going concern, (ii) protecting its valuable member relationships, and (iii) facilitating the sharing of eligible member sharing requests.

This Chapter 11 Plan contemplates Sharity transitioning to its new preferred vendor contracts and continuing to operate after emerging from bankruptcy.

Sharity's goal is to facilitate as much sharing of the Members' medical expenses as possible while ensuring that only eligible medical expenses are shared between Members. Sharity generates revenue by retaining a portion of member donations to ensure its financial viability and satisfy operating expenses, which include, among other things, funds spent to ensure that sharing requests are legitimate and eligible for sharing under the applicable guidelines for each program offered by Sharity. Sharity will fund distributions under the Plan in the same manner in accordance with the financial projections attached hereto as **_Exhibit 1._** [2]

The Plan provides for full payment of secured, administrative, and priority claims in accordance with the Bankruptcy Code. The following is an estimate of the distribution of Sharity's plan payments, and whether each class is impaired and entitled to vote on the Plan:

---

[2] All Exhibits to the Plan will be filed with the solicitation version of the Plan.

| Class | Type | Estimated Amount of Claims | Recovery Estimate | Treatment | Entitled to Vote? |
|-------|------|---------------------------|-------------------|-----------|-------------------|
| 1 | Secured Claims | $0.00 | 100% | Unimpaired. Except to the extent that a Holder of an Allowed Miscellaneous Secured Claim Agrees to less favorable treatment, the Holder of such claim will receive or retain: (i) the collateral securing such Allowed Miscellaneous Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such allowed Miscellaneous Secured Claim; (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired; or (iv) such other treatment as to which the holder of an allowed Miscellaneous Secured Claim agrees. | No. Deemed to accept. |
| 2 | Priority Non-Tax Claims | $0.00 | 100% | Unimpaired. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, the Holder of such a claim will receive (i) payment in full in Cash, or (ii) such other treatment as to which the holder of an Allowed Priority Non-Tax Claim agrees. | No. Deemed to accept. |
| 3 | General Unsecured Claims | De minimis[3] amount | [    ][4] | Impaired. In full satisfaction, settlement, release, and discharge of such Claim, each holder of an Allowed Class 3 Claim shall receive the following treatment upon the Effective Date of the Plan: (i) commencing on the first full quarter following the Effective Date, holders of Allowed Unsecured Claims will receive Pro Rata Distributions on a quarterly basis in an amount equal to the projected disposable income of the Debtor for the three (3) year period following the Effective Date for a total of twelve (12) quarterly payments. Pursuant to the Projection Analysis attached as ***Exhibit 1*** | Yes |

---

[3] Sharity estimates that it has liquidated Unsecured Claims of a de minimis amount (not including disputed Unsecured Claims).

[4] All Exhibits to the Plan, including financial projections, will be filed with the solicitation version of the Plan.

| 4 | Section 510(c) Claims | Unknown | 0% | On the Effective Date, all Allowed Section 510(c) Claims shall be fully extinguished and discharged without any further action. Holders of Allowed Section 510(c) Claims shall not be entitled to receive or retain any property under the Plan. | No. Deemed to reject. |

*(continued from previous row)* and discussed in Section 1.8 of the Plan, the Debtor's projected net disposable income for the relevant three-year period totals [___].

# ARTICLE 1
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

**1.1    Nature of the Debtor's Business.**

Sharity is a Section 501(c)(3) faith-based nonprofit corporation that operates a HCSM.

**1.2    History of Business Operations of the Debtor.**

Sharity was incorporated in Delaware in 2018 under the name Trinity Healthshare, Inc. and later amended its certificate of incorporation to change its name to Sharity Ministries, Inc. At all times since its formation, Sharity has operated a HCSM.

**1.3    Filing of the Debtor's Chapter 11 Case.**

On July 8, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under the Bankruptcy Code. The Chapter 11 Case is pending in the United States Bankruptcy Court for the District of Delaware.

**1.4    Legal Structure and Ownership.**

Sharity is a Section 501(c)(3) nonprofit corporation. As a result, it has no stock and no person or entity owns it. Sharity is operated by its Board of Directors, which consists of the following people: Christopher Sizemore (Chairman), Stephen Vault, Joseph Handy, A. Joseph Guarino III, and William "Rip" Thead III. Messrs. Sizemore, Vault, and Handy are independent directors of Sharity.

**1.5    Debtor's Assets.**

Sharity's assets primarily consist of voluntary monthly contributions from its Members. On the Petition Date, Sharity had approximately $4.8 million in cash on hand. Sharity also owns assets that have minimal or unknown value, such as (i) prepaid expenses and security deposits of approximately $971,744 (inclusive of professional retainers), (ii) miscellaneous office furniture and supplies with an unknown value, (iii) the trademark "Sharity Ministries" and various website domain names with unknown values, (iv) its membership list with an unknown value, and (v) and

potential claims or causes of action against the Aliera Companies and others with an unknown value.

### 1.6    Debtor's Liabilities.

Sharity does not believe that any person holds a secured claim against it or that it has any Priority Unsecured Claims. Sharity estimates that it has liquidated Unsecured Claims of a de minimis amount (not including disputed Unsecured Claims).

For the avoidance of doubt, Members that have submitted Share Requests for medical expenses are not Creditors of Sharity, and are not treated as such hereunder because Sharity does not promise or agree to pay a Member's medical expenses. Rather, Sharity acts as a platform to facilitate the sharing of eligible Share Requests between Members. Under the terms of this Plan, Confirmation will not discharge or eliminate such Share Requests, and Sharity will continue reviewing for eligibility, approving, and paying such Share Requests in the ordinary course of business after Confirmation of the Plan.

### 1.7    Current and Historical Financial Conditions.

Copies of Sharity's most recent financial statements were filed with the Court on the Petition Date. Over the past three years, Sharity's approximate gross revenues were as follows: $68.8 million (2019), $127 million (2020), and $33.8 million (year to Petition Date 2021; or approximately $64.1 million annualized). For the reasons set forth below, Sharity believes that the transition to its contracts with the TPA and Related Vendors will improve its financial condition on a going forward basis.

### 1.8    Events Leading to the Filing of the Bankruptcy Case.

Sharity partners with outside firms to provide various management and administrative services necessary to support the program operations. Until recently, Sharity was a party to a series of vendor agreements with subsidiaries of the Aliera Companies. Under the Aliera Contracts, Sharity retained certain of the Aliera Companies to, among other things, provide (i) administrative services, (ii) information technology related services, (iii) marketing, brand development, and sale services, and (iv) regulatory and compliance services.

Recently, various governmental units and private parties have brought investigations, claims, or lawsuits against the Aliera Companies, and in some cases, Sharity itself. Sharity's involvement in these matters has negatively impacted Sharity's reputation, financial position, and membership levels. Sharity is currently investigating whether there is a backlog of Share Requests that were not paid while it was operating under the Aliera Contracts. Also, Sharity is investigating whether the Aliera Companies owe amounts that should have been paid to Members during such prior contract terms, and/or owe money or damages directly to Sharity.

As a result of the Strategic Process (described in more detail in the Summary, above), Sharity identified certain third-party service providers (the "TPA and Related Vendors") that Sharity believes can provide a high-quality level of service that Sharity and its Members expect at more competitive prices and decided to reduce the number of states in which it operates.

Sharity filed the above-captioned bankruptcy case to facilitate the transition to the TPA and Related Vendors and to right-size its operations in an orderly and efficient manner that minimizes any disruption to its Members, all while (i) continuing to operate as a going concern in fulfillment of its charitable mission, (ii) protecting its valuable member relationships, and (iii) facilitating the sharing of eligible member Share Requests. Sharity also does not have the ability to terminate the Aliera Contracts without significant termination periods.

The Plan contemplates the creation of a Creditor Trust that will be funded with the Net Disposable Income of Sharity. The Creditor Trustee will operate the Creditor Trust for the benefit of Allowed Unsecured Claims. Unsecured Creditors are entitled to a Pro Rata Share of Net Disposable Income, which will be distributed by the Creditor Trustee in accordance with the Creditor Trust Agreement.

This Plan is an integral part of Sharity's overall business transition plan and Sharity believes that Confirmation of the Plan will allow Sharity to emerge from bankruptcy as the Reorganized Debtor poised for long-term success. This Plan also allows Sharity to elect, as an alternative to continuing to operate, to cease operations if it deems that to be in the best interests of its Members, but the cessation of operations shall not relieve Sharity of the obligation to fully fund the Creditor Trust.

## 1.9     Significant Events During the Bankruptcy Case.

### A.     First Days Orders.

On the Petition Date, Sharity filed several "first day" motions with the Bankruptcy Court seeking various forms of relief designed to facilitate a smooth transition for the Sharity into Chapter 11. As of the filing of this Plan, the Bankruptcy Court had not held a hearing to consider the first day motions, but Sharity expects that to occur with five days of the Petition Date. Sharity has requested that the Bankruptcy Court enter the following orders:

- o *Interim Order (I) Authorizing the Debtor to (A) Pay Pre-Petition Employee Wages, Salaries, Benefits, and Reimbursable Expenses, and Other Associated Obligations, and (B) Continue the Post-Petition Maintenance of Employee Benefit Programs, Policies, and Procedures; and (II) Granting Related Relief.*

- o *Interim Order (I) Authorizing the Debtor to (A) Continue to Operate its Cash Management System, (B) Maintain its Bank Accounts and Pay Bank and Processor Charges, and (C) Maintain Existing Business Forms; (II) Granting a Limited Waiver of the Requirements of Section 345(b) of the Bankruptcy Code, to the Extent Applicable; and (III) Granting Certain Other Related Relief.*

- o *Interim Order Authorizing the Debtor to Continue Paying Share Requests of Its Members in Furtherance of Its Charitable Mission.*

- o *Order (I) Approving the Scope of Notice with Respect to the Debtor's Members, (II) Approving Opt-In Procedure for Additional Notice, and (III) Granting Related Relief.*

### B. Employment of Professionals and Advisors.

Sharity has also requested that the Bankruptcy Court approve its employment of various professionals and advisors to assist with this Chapter 11 Case. Specifically, Sharity has requested Bankruptcy Court approval to retain: (i) Baker & Hostetler LLP as its legal counsel; (ii) Landis Rath & Cobb LLP as co-counsel; (iii) SOLIC Capital Advisors, LLC to provide services and certain interim officers, including Neil Luria as Chief Restructuring Officer, Raoul Nowitz as Assistant Chief Restructuring Officer, and Kevin Tavakoli as Director of Finance; and (iv) BMC Group, Inc. as its claims and noticing agent. As of the filing of this Plan, the Bankruptcy Court had not held a hearing to consider these requests to approve employment of professionals and advisors.

### C. Assumption or Rejection of Certain Contracts.

In order to transition from partnering with the Aliera Companies to the TPA and Related Vendors, on July 8, 2021, Sharity filed a motion to authorize the rejection of all or substantially all of the Aliera Contracts. The Bankruptcy Court has not yet held a hearing to consider this motion. Sharity intends to work diligently and in good faith with the Aliera Companies to transition to the TPA and Related Vendors, and Sharity intends to assume the contracts with the TPA and Related Vendors in accordance with this Plan.

### D. Stay of Pending Litigation.

As set forth in the Schedules and First Day Affidavit, as of the Petition Date, Sharity was a party to a number of investigations, claims, or lawsuits. The automatic stay under section 362(a) of the Bankruptcy Code had the immediate effect of halting a significant number such actions against Sharity, allowing Sharity to save money that would otherwise have been used on legal expenses.

### E. Claims Process and Bar Date.

1. **Schedules and Statements.** On July 8, 2021, Sharity filed its Schedules with the Bankruptcy Court. The U.S. Trustee is scheduled to hold the meeting of creditors pursuant to section 341(a) of the Bankruptcy Code on [    ], 2021.

2. **Bar Dates.** As set forth in the Notice of Commencement, the (a) General Bar Date is September 6, 2021; and the Governmental Unit Bar Date is January 4, 2022.

### 1.10 Projected Recovery of Avoidable Transfers.

Sharity has not yet completed its investigation with regard to prepetition transactions. Sharity anticipates completing its investigation by January 1, 2022. If you received a payment or other transfer of property within 90 days of bankruptcy, Sharity may seek to avoid such transfer.

**ARTICLE 2**
**THE PLAN**

The Debtor's Plan must describe how its Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Code, the Plan places Claims in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims is impaired or unimpaired. A Claim can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

**2.1     Unclassified Claims.**

Certain types of Claims are automatically entitled to specific treatment under the Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any class:

**A.     Administrative Expenses.**

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1.     If the Debtor trades in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

2.     If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.

3.     Administrative Expenses also include any post-petition fees and expenses allowed to professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 | Payment through the Plan as follows: Paid in full in the ordinary course of business. |
| Administrative Tax Claims | $0.00 | Payment through the Plan as follows: Paid in full in the ordinary course of business. |
| Professional fees, as approved by the Bankruptcy Court | [     ][5] | After Bankruptcy Court approval, Payment through the Plan as follows: Paid in full on the Effective Date |
| Clerk's Office fees | $0.00 | Paid in full on the Effective Date. |
| Other Administrative Expenses | $0.00 | Payment through the Plan as follows: |
| Subchapter V Trustee | [     ] | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: Paid in full on the Effective Date. |
| TOTAL | [     ] | |

## B.     Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

*Classification:* Sharity does not believe that any Priority Tax Claims exist, but includes this class in an abundance of caution to provide a treatment in accordance with the requirements of the Bankruptcy Code to the extent such claims exist.

*Treatment:* Except to the extent that a Holder agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive from Sharity, in full satisfaction of such Claim, payments equal to the Allowed Amount of such Claim. Allowed Priority Tax Claims will be paid over a period of five years from the Petition Date with interest at the current Federal judgment rate of interest; the payments will be made quarterly. Payments will commence on the later of the first day of the first full quarter following the Effective

---

[5] The estimated Amount of Administrative Expense Claims will be provided in the solicitation version of the Plan.

Date, or on the first day of the first full quarter following the date that the respective Priority Tax Claim becomes Allowed.

## 2.2    Classes of Claims.

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### A.    Classes of Secured Claims.

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim. In addition, certain claims secured only by the debtor's principal residence, may require different treatment pursuant to § 1190(3) of the Code as set forth below, if applicable.

#### 1.    Class 1 – Secured Claims.

*Classification:*  Sharity does not believe that there are any secured prepetition Claims, but includes this class in an abundance of caution to provide a treatment in accordance with the requirements of the Bankruptcy Code to the extent such claims exist.

*Treatment:* Each holder of an Allowed Secured Claim will be placed in a separate subclass, and each subclass will be treated as a separate class for distribution purposes. On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, each holder of an Allowed Secured Claim shall receive, in full and final satisfaction of such Claim, in the sole discretion of the Sharity, except to the extent any holder of an Allowed Secured Claim agrees to different treatment, either: (i) the collateral securing such Allowed Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Secured Claim; or (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired.

*Voting:* Class 1 is Unimpaired, and the holders of Secured Claims are conclusively deemed to have accepted the Plan.

### B.    Classes of Priority Unsecured Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

#### 1.    Class 2 – Priority Non-Tax Claims.

*Classification:*  Sharity does not believe that there are any Priority Non-Tax Unsecured Claims but includes this class in an abundance of caution to provide a treatment in accordance with the requirements of the Bankruptcy Code to the extent such claims exist.

*Treatment*: On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, unless otherwise agreed to by the holder of an Priority Non-Tax Claim, each holder of an Priority Non-Tax Claim shall receive, in full and final satisfaction of such Claim, one of the following treatments, in the sole discretion of Sharity: (a) full payment in Cash of its Allowed Priority Non-Tax Claim; or (b) treatment of its Allowed Priority Non-Tax Claim in a manner that leaves such Claim Unimpaired.

### C.    Classes of General Unsecured Claims.

General Unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of Classes 3 & 4, which contains General Unsecured Claims and Section 510(c) Claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 3 | General Unsecured Claims | Impaired | In full satisfaction, settlement, release, and discharge of such Claim, each holder of an Allowed Class 3 Claim shall receive Beneficial Interests in the Creditor Trust entitling the Holder to a Pro Rata Share of the following distributions: commencing on the first full quarter following the Effective Date, the Creditor Trust shall make twelve (12) quarterly distributions in an amount totaling, in the aggregate, the Net Disposable Income of the Debtor for the three (3) year period following the Effective Date. Pursuant to the Projection Analysis attached as ***Exhibit 1*** and discussed in Section 1.8 of the Plan, the Debtor's Net Disposable Income for the relevant three-year period totals [        ]. |
| 4 | Section 510(c) Claims | Impaired | On the Effective Date, all Allowed Section 510(c) Claims shall be fully extinguished and discharged without any further action. Holders of Allowed Section 510(c) Claims shall not be entitled to receive or retain any property under the Plan. |

### D.    No Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are Equity Interest holders. In a partnership, Equity Interest holders include both general and limited partners. In a limited liability company ("LLC"), the Equity Interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the Equity Interest holder.

Sharity is a non-profit corporation formed under Delaware law, and accordingly, has no Equity Interest holders.

**2.3     Member Share Requests.**

Members of Sharity are not treated as Creditors on account of any pre- or post-petition Share Requests because Sharity does not promise or agree to satisfy Share Requests directly. Rather, Sharity acts as a platform to facilitate the sharing of eligible Share Requests between Members. For the avoidance of doubt, under the terms of this Plan, Confirmation will not discharge or eliminate such Share Requests, and Sharity will continue reviewing for eligibility, approving, and disbursing funds with respect to such Share Requests in the ordinary course of business after Confirmation of the Plan but Sharity will not be legally obligated to fund any Share Requests. Members shall not be required to re-submit Share Requests that were properly submitted in accordance with applicable guidelines before the Petition Date. While the Reorganized Debtor will continue to try to honor prior Share Requests, to the extent a Member or former member believes he or she has a Claim, he or she should file a Claim and shall be treated as a General Unsecured Creditor in Class 3 solely for the purpose of voting on the Plan and subject to Sharity's right to object on any basis.

**2.4     Estimated Number and Amount of Claims Objections.**

The Creditor Trust or Reorganized Debtor may object to the amount or validity of any Claim within 60 days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan.

This Plan is being filed prior to the General Bar Date and Governmental Unit Bar Date. Accordingly, Sharity does not know what Claims will ultimately be filed against it, or therefore, which claims it will object to. In general, Sharity is likely to object to any Claim that is for an amount materially greater than is recorded in Sharity's books and records, which are reflected in the Schedules.

**2.5     Treatment of Executory Contracts and Unexpired Leases.**

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

Check all that apply:

[_X_] Assumption of Executory Contracts.

The Executory Contracts shown on ***Exhibit 2*** shall be assumed by the Debtor. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code,

if any. ***Exhibit 2*** also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

[***X***] Rejection of Executory Contracts and Unexpired Leases.

The Executory Contracts shown on ***Exhibit 3*** shall be rejected by the Debtor.

Further, the Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly shown on ***Exhibit 2***, or not assumed before the date of the order confirming the Plan.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as an unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

**The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of an Executory Contract Is [        ].** Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.

**2.6     Means for Implementation of the Plan.**

**A.     Continued Corporation Existence.** Sharity, as a Reorganized Debtor, shall continue to exist after the Effective Date with all powers of a non-profit corporation under the laws of the State of Delaware; and, following the Effective Date, the Reorganized Debtor may operate its business free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Court, subject only to the terms and conditions of this Plan and Confirmation Order.

**B.     Vesting of Reorganized Debtor's Assets Free and Clear.** On the Effective Date, all property of the Debtor, tangible and intangible, including, without limitation, Causes of Action, will vest, in the Reorganized Debtor. Such transfer shall be free and clear of Claims, Liens, Interests, encumbrances, and contractually imposed restrictions except as otherwise provided herein. The Debtor expects to have sufficient cash on hand to make the payments required on the Effective Date.

**C.     Management of Reorganized Debtor.** The Board of Directors of the Debtor immediately prior to the Effective Date shall serve as the initial Board of Directors of the Reorganized Debtor on and after the Effective Date. Each member of the Board of Directors shall serve in accordance with applicable non-bankruptcy law and the Debtor's certificate or articles of incorporation and bylaws, as each of the same may be amended from time to time.

### D.    Creation and Funding of Creditor Trust.

1.    Formation of Creditor Trust. On the Effective Date, the Creditor Trust Agreement shall be executed by the Reorganized Debtor and Creditor Trustee, and all other necessary steps shall be taken to establish the Creditor Trust for the benefit of Class 3 Allowed Unsecured Creditors. A copy of the Creditor Trust Agreement will be included in the Plan Supplement.

2.    Funding of Creditor Trust.    The Reorganized Debtor shall be responsible for funding the Creditor Trust with sufficient Cash or other assets to allow it to pay all Creditor Trust expenses and make Distributions to Class 3 Allowed Unsecured Creditors in accordance with the Plan.

3.    Material Terms of Creditor Trust. The following provisions are intended to summarize the material terms of the Creditor Trust Agreement, which shall control the formation, operations, and dissolution of the Creditor Trust. In the event of a conflict between the terms of this section and the terms of the Creditor Trust Agreement, the Creditor Trust Agreement shall control.

(1)    Purpose of Creditor Trust.    The Creditor Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the pursuit of a trade or business.

(2)    The Creditor Trustee. The Creditor Trustee shall be Neil F. Luria. The Debtor's designation of the Creditor Trustee shall be effective as of the Effective Date without the need for further order of the Bankruptcy Court.

(3)    Authority of the Creditor Trustee.    Subject only to the limitations contained in the Plan or the Creditor Trust Agreement, the Creditor Trustee shall have, by way of illustration and not limitation, the following duties, responsibilities, authorities, and powers: (A) the power and authority to hold, manage, sell, and distribute Creditor Trust Assets in accordance with the Plan; (B) the power and authority to prosecute and resolve objections to Claims against the Debtor that are payable from the Creditor Trust; (C) the power and authority to perform such other functions as are provided in the Plan and Creditor Trust Agreement; and (D) any other act the Creditor Trustee deems in the best interest of the Creditor Trust.

(4)    Governance of Creditor Trust.    The Creditor Trust shall be governed in accordance with the Creditor Trust Agreement and consistent with the Plan.

(5)    Distributions to Class 3 Allowed Unsecured Claims. The Creditor Trustee shall be responsible for making distributions from the Creditor Trust as provided in the Plan and Creditor Trust Agreement. Any Creditor Trust Assets available for distribution shall be applied (a) first, to pay or reimburse, as applicable, the reasonable, documented out of pocket fees, costs, expenses, and liabilities of the Creditor Trust and Creditor Trustee, (b) second, to distributions to holders of Beneficial Interests.

(6)     Compensation of Creditor Trustee and Professionals. The Creditor Trustee and his retained professionals (if any) shall be entitled to reasonable compensation from the Creditor Trust as set forth in the Creditor Trust Agreement.

(7)     Dissolution. The Creditor Trust and Creditor Trustee shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the Creditor Trust under the Plan have been made, but in no event shall the Creditor Trust be dissolved later than four (4) years from the Effective Date, absent Bankruptcy Court approval.

(8)     Indemnification of Creditor Trustee. The Creditor Trustee and his agents and professionals shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Creditor Trust or Creditor Trustee, except for those acts arising primarily and directly out of its or their own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification and reimbursement for fees and expenses incurred in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Creditor Trust or Creditor Trustee.  Any indemnification claim of the Creditor Trustee, his agents or professionals, shall be satisfied from the Creditor Trust as such costs or expenses are incurred. The Creditor Trustee shall be entitled to rely, in good faith, on the advice of his retained professionals.

## E.     Preservation of Causes of Action.

(a)     On the Effective Date, the Causes of Action shall be vested exclusively in the Reorganized Debtor, except to the extent a Creditor other third party has, prior to the Effective Date, been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court. The Reorganized Debtor will have the rights, powers, and privileges to pursue, not pursue, settle, release, or enforce any Causes of Action without seeking approval from the Bankruptcy Court.  The Debtor is currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. Any Person that engaged in business or other transactions with the Debtor prior to the Debtor's Petition Date or that received payments from the Debtor prior to the Debtor's Petition Date may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation.

(b)     No Creditor or other Person should vote for the Plan or otherwise rely on Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action.  No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE REORGANIZED DEBTOR. Creditors are advised that legal rights, claims, and rights of action the Debtor may have against them, if they exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtor to release such claims.  As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim, or Cause of Action against a particular Creditor in the Plan, or the Schedules or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that

the Debtor or Reorganized Debtor does not possess or does not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. IT IS THE EXPRESSED INTENTION OF THE PLAN TO PRESERVE RIGHTS, CLAIMS, AND CAUSES OF ACTION OF THE DEBTOR, WHETHER NOW KNOWN OR UNKNOWN, FOR THE BENEFIT OF THE DEBTOR'S ESTATE AND ITS CREDITORS. To the fullest extent allowed under applicable law, nothing in the Plan operates as a release of any Cause of Action, except as expressly provided otherwise, nor shall the Debtor's failure to describe with specificity any Cause of Action estop or preclude the Reorganized Debtor from pursuing such Causes of Action.

**F.      Effectiveness of Securities, Instruments, and Agreements.** On the Effective Date, all documents or agreements entered into or documents issued pursuant to the Plan or in connection with the Plan shall become effective and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

**G.      Term of Injunctions or Stays.** Unless otherwise expressly provided herein, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Case.

**H.      Option to Liquidate Reorganized Debtor.** At any time after the Effective Date, the Reorganized Debtor may cease operations and be liquidated if the Reorganized Debtor's Board of Directors deems it to be in the best interests of its Members. For the avoidance of doubt, the Reorganized Debtor's cessation of operations shall not relieve the Reorganized Debtor of the obligation to fully fund the Creditor Trust in accordance with the Plan. In the event the Reorganized Debtor elects to cease operations, it shall contribute all of its assets to the Creditor Trust.

### 2.7      Payments.

Payments to Creditors provided for in the Plan will be made by the Trustee pursuant to §1194(a), except for payments to Class 3 Allowed General Unsecured Creditors on account of their Beneficial Interests, which shall be made by the Creditor Trust.

### 2.8      Post-Confirmation Management.

The Post-Confirmation Officers/Managers of the Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
| --- | --- | --- |
| Christopher Sizemore | Chairman of Board of Directors | $2,000 per month |
| Stephen Vault | Member of Board of Directors / Secretary | $1,500 per month |
| Joseph Handy | Member of Board of Directors / Treasurer | $1,500 per month |

| A. Joseph Guarino III | Member of Board of Directors / President | $13,333 per month |
|---|---|---|
| William "Rip" Thead III | Member of Board of Directors / CEO | $11,250 per month |
| Kathee W. Hawkins | Controller | $21,000 per month |
| Joy C. Spriggs | Vice President of Member Experience | $4,500 per month |

### 2.9     Tax Consequences of the Plan.

*Creditors Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

The following is a summary of certain United States ("U.S.") federal income tax consequences of the Plan for certain holders of Allowed Claims. It does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations thereunder ("Treasury Regulations"), and administrative and judicial interpretations, all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtor does not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. There can be no assurance that the IRS will not challenge one or more of the U.S. federal income tax consequences of the Plan described below.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtor). This summary does not apply to holders of a Claim that are not United States persons, as such term is defined in the Internal Revenue Code ("Non-U.S. Holders"), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtor within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold any consideration received pursuant to the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that Claims will be

treated in accordance with their form for U.S. federal income tax purposes.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtor and Holders of Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtor engaged in.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner and the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### A.      Certain U.S. Federal Income Tax Consequences to holders of General Unsecured Claims.

Because Holders of General Unsecured Claims are expected to receive nothing but Cash in satisfaction of their Claims, such Holders will be treated as receiving their distribution under the Plan in taxable exchange under Section 1001 of the Tax Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), a U.S. Holder of such a claim would recognize gain or loss equal to the difference between (a) the sum of the cash and the fair market value (or issue price, in the case of debt instruments) of the consideration received and (b) such U.S. Holder's adjusted basis in such Claim. See discussion below regarding the extent to which any consideration should be treated as attributable to accrued interest (or OID).

1.  Disputed Ownership Fund Treatment.

Certain proceeds from the disposition of the Debtor's assets may be deposited into an account pending the resolution of disputed claims. The Debtor intends that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

To the extent that a U.S. Holder receives distributions with respect to a Claim subsequent to the Effective Date, such U.S. Holder may recognize additional gain (if such U.S. Holder is in a gain position), and a portion of such distribution may be treated as imputed interest income. In addition, it is possible that the recognition of any loss realized by a U.S. Holder may be deferred until all payments have been made out of any such account. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such U.S. Holders in respect of their Claims due to the receipt of property in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

2.  Accrued Interest and OID.

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest or OID on such Claims. Such amounts should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtor. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest or OID on Allowed Claims, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

3.   Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

4.   Medicare Tax on Net Investment Income.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**2.10    Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan.**

Debtor has provided projected financial information. Those projections are listed in ***Exhibit 1.***

# ARTICLE 3
## FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 3.1     Ability to Initially Fund Plan.

The Debtor believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid pursuant to the Plan. Tables showing the amount of cash on hand on the Effective Date of the Plan, and the sources of that cash, are attached hereto as *Exhibit 4*.

### 3.2     Ability to Make Future Plan Payments And Operate Without Further Reorganization.

The Debtor must submit all or such portion of the future earnings or other future income of the Debtor to the supervision and control of the Trustee as is necessary for the execution of the Plan.

The Debtor has provided projected financial information. Those projections are listed in *Exhibit 1* (referenced in § 2.10, above).

The Debtor's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post- confirmation taxes, of [      ]. The final Plan payment is expected to be paid on [     ].

As with any projection of future financial performance, the Debtor's projections rely on certain assumptions.  The primary assumptions are identified in *Exhibit 1* with an explanation as to why the Debtor believes the assumption is appropriate here.

**You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.**

# ARTICLE 4
## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors holders who do not accept the Plan will receive at least as much under the Plan as such Claimants holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as *Exhibit 5*.

# ARTICLE 5
## DISCHARGE

**5.1** **Discharge.**

**If the Plan is confirmed under § 1191(a)**, on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or

**If the Plan is confirmed under § 1191(b)**, as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan, except any debt—

    (1)    on which the last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the court; or

    (2)    if applicable, of the kind specified in section 523(a) of this title.

# ARTICLE 6
## GENERAL PROVISIONS

**6.1** **Title to Assets.**

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Reorganized Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims of Creditors, equity security holders, and of general partners in the Debtor.

If a plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the estate.

**6.2** **Binding Effect.**

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

**6.3     Severability.**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**6.4     Retention of Jurisdiction by the Bankruptcy Court.**

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193; (iii) to hear and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action.

**6.5     Captions.**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**6.6     Modification of Plan.**

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under Section 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**6.7     Final Decree.**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

**6.8     Provisions Governing Distributions.**

**A.     Delivery of Distributions.**  Unless otherwise provided in the Plan, all distributions to any holder of an Allowed Claim will be made to the holder of each Allowed Claim

at the holder at the address of such holder as listed in the Schedules, or on the books and records of the Debtor or their agents unless the Debtor or Creditor Trust have been notified, in advance, in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides for an address for such holder different from the address reflected in the Schedules or in the Debtors' books and records.

**B.      Unclaimed Distributions.** A Distribution that is not claimed by a holder of an Allowed Claim on or before 90 days from the date the Debtor or Creditor Trustee, as applicable, makes such Distribution shall be deemed an "unclaimed distributions." Unclaimed distributions shall revert to the Debtor or Creditor Trustee that attempted to make the distribution.

**C.      Minimum Distributions.** No payment of Cash less than $50 shall be made by the Debtor or Creditor Trustee, and any payment required to be made hereunder that would total less than $50 shall be deemed waived.

**6.9      Releases and Injunctions.**

**A.      Injunction Related to Discharge.**

**Except as otherwise expressly provided in the Plan, Confirmation Order, or separate order of the Court, all Persons who have held, hold, or may hold Claims against the Debtor are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or other against the Debtor on account of any such Claim, (iii) creating, perfecting, or enforcing any Lien or asserting control of any kind against the Debtor or Reorganized Debtor or their property or interests in property on account of any such Claim, and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim. Such injunctions shall extend to successors of the Debtor (including, without limitation, the Reorganized Debtor) and their respective properties and interests in property.**

**B.      Consensual Releases by Holders of Impaired Claims.**

**Unless a holder of a Claim in an impaired class that is entitled to vote (i) opts out of the releases contained herein; or (ii) files an objection to such releases in connection with Plan confirmation, and except as otherwise provided herein, this Plan, and the provisions and distributions set forth herein, is a full and final settlement and compromise of all Claims and causes of action, whether known or unknown, that the holders of Claims against the Debtor may have against the Debtor, the Debtor's Estate, and the Reorganized Debtor pursuant to sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019. Except as provided in the Plan, in consideration of the obligations of the Debtor and the Reorganized Debtor under the Plan, the securities, contracts, instruments, releases, and other agreements or documents to be delivered in connection with this Plan, the Debtor and each holder of a Claim against the Debtor shall be deemed to forever release, waive, and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes**

of action and liabilities (other than the rights to enforce the Debtor's or the Reorganized Debtor's obligations under this Plan and the securities, contracts, instruments, releases, and other agreements and documents delivered thereunder) against the Debtor, the Debtor's Estate, and the Reorganized Debtor, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Bankruptcy Case or the conduct thereof, or this Plan.

### C. Debtor Releases.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the Debtor, on its own behalf and as a representative of its bankruptcy estate, to the fullest extent permitted under applicable law, shall, and shall be deemed to, completely and forever release, waive, void, and extinguish unconditionally, the Debtor and all of its officers, directors, employees, advisors, professionals, independent contractors, or agents, (collectively, "Released Parties") and each and all of the released Debtor's directors and officers, of and from any and all Claims, Causes of Action, interests, obligations, suits, judgments, damages, debts, rights, remedies, set offs, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, tort, contract, or otherwise, that are or may be based in whole or part on any act, omission, transaction, event, occurrence, or other circumstance, whether direct or derivative, taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtor or its operations, its assets, the bankruptcy estate, or the Chapter 11 Case, that may be asserted by or on behalf of the Debtor or its bankruptcy estate, against any of the Released Parties; *provided*, *further*, that nothing in this section shall operate as a release, waiver or discharge of any causes of action or liabilities arising primarily and directly out of gross negligence, willful misconduct, fraud, or criminal acts of any such Released Party as determined by a Final Order.

### D. Injunction Against Interference with Plan.

Upon the entry of the Confirmation Order, all holders of Claims and other Parties in Interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 6.10 Exculpation.

Neither the Debtor nor any of its officers, directors, employees, advisors, professionals, independent contractors, or agents, (collectively, "Exculpation Parties") any liability to any entity for any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in

law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances taking place or arising from and after the Petition Date and prior to the Effective Date related in any way to the Debtor, including, without limitation, those that any of the Debtor would have been legally entitled to assert or that any Holder of a Claim or other entity would have been legally entitled to assert for or on behalf of any of the Debtors or the bankruptcy estate and further including those in any way related to the Chapter 11 Case, Creditor Trust Agreement or this Plan, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the post-petition debtor-in-possession financing approved by the Bankruptcy Court, the Creditor Trust Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other post-petition act taken or omitted to be taken in connection with the Debtor; **provided**, **however**, the foregoing provisions of this section shall have no effect on the liability of any entity that arises primarily and directly from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

### 6.11 Revocation of Withdrawal of Plan.

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Debtors take such action, the Plan shall be deemed null and void.

### 6.12 Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware shall govern the construction and implementation hereof and any agreements, documents, and instruments executed in connection with this Plan and (b) the laws of the state of incorporation or organization of the Debtor shall govern corporate or other governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.

### 6.13 Exemption from Transfer Taxes.

Subject to orders entered by the Bankruptcy Court prior to the Confirmation Date authorizing certain sales of real property, pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

### 6.14 Successors and Assigns.

All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

**6.15    Entire Agreement.**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**ARTICLE 7**
**ATTACHMENTS**

The following documents accompany the Plan[6]:

[X]    Financial Projections for the Debtor, annexed as **Exhibit 1**.

[X]    Executory Contracts and Unexpired Leases, to be Assumed annexed as **Exhibit 2**.

[X]    Executory Contracts and Unexpired Leases to be Rejected, annexed as **Exhibit 3**.

[X]    Cash Flow Forecast, annexed as **Exhibit 4**.

[X]    Liquidation Analysis, annexed as **Exhibit 5**.

[X]    Debtor's most recent financial statements issued before bankruptcy, annexed as **Exhibit 6**.

**ARTICLE 8**
**FREQUENTLY ASKED QUESTIONS**

**What Is Sharity Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11. The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a plan of reorganization, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If the creditors are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

**How Do I Determine Which Class I Am In?** To determine the class of your claim or interest, you must first determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your claim is unsecured. The Table of Contents will direct you to the treatment provided to the class in which you are grouped. The pertinent section of the Plan dealing with that class will explain, among other things, who is in that class, what is the size of the class,

---

[6] All Exhibits to the Plan will be filed with the solicitation version of the Plan.

what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. Section 2.2 lists all classes of claimants and their types of claims.

**Why Is Confirmation of a Plan of Reorganization [or Liquidation] Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Reorganization?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**Am I Entitled to Vote on the Plan?** Any creditor of the Debtor whose claim is IMPARIED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** Section 2.2 of the Plan identifies the classes of creditors whose claims are impaired. If your claim is impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to all claim holders for their review, consideration and approval. The deadline by which ballots must be returned is [       ]. Ballots should be mailed to the following address: [       ].

**How Do I Determine When and How Much I Will Be Paid?** In Section 2.2, the Debtor has provided both written and financial summaries of what it anticipates each class of creditors will receive under the Plan.

## ARTICLE 9
## DEFINITIONS

**9.1**     The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Code are for convenience of reference only, and are superseded by the definitions found in the Code.

**9.2     Administrative Claimant**: Any person entitled to payment of an Administration Expense.

**9.3     Administrative Convenience Class**: A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

**9.4     Administrative Expense**: Any cost or expense of administration of the Chapter 11 Case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

**9.5     Administrative Tax Claim**: Any tax incurred pursuant to Section 503(b)(1)(B) of the Code.

**9.6     Aliera Companies**: means The Aliera Companies, Inc., and any affiliated or related entities, including but not limited to (i) Advevo, LLC; (ii) Ensurian Agency, LLC; (iii) Tactic Edge Solutions, LLC; and (iv) USA Benefits & Administrators, LLC.

**9.7     Aliera Contracts**: means any contract between the Debtor and any of the Aliera Companies.

**9.8     Allowed Claim**: Any claim against the Debtor pursuant to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.9     Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**9.10     Allowed Priority Non-Tax Claim**: means a Priority Non-Tax Claim to the extent such Priority Non-Tax Claim is or becomes an Allowed Claim.

**9.11     Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

**9.12     Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**9.13     Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**9.14**    **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

**9.15**    **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

**9.16**    **Beneficial Interests** means the uncertificated beneficial interests in the Creditor Trust evidencing the right of each holder of Class 3 Allowed Unsecured Claims against the Debtor to receive distributions from the Creditor Trust in accordance with the Plan and Creditor Trust Agreement.

**9.17**    **Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

**9.18**    **Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Sharity Ministries Inc. is the Debtor-in-Possession.

**9.19**    **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**9.20**    **Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**9.21**    **Collateral**: means any property or interest in property of the estate of the Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**9.22**    **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

**9.23**    **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**9.24**    **Confirmation Hearing**: The hearing to be held on [      ], 2021 to consider confirmation of the Plan.

**9.25**    **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**9.26**    **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

**9.27    Creditor Trust**: means the liquidating trust that will come into existence on the Effective Date for the benefit of Class 3 Allowed Unsecured Claims, and which will be formed pursuant to and governed by the Creditor Trust Agreement.

**9.28    Creditor Trustee**: means Neil F. Luria, not individually but solely in his capacity as Trustee of the Creditor Trust.

**9.29    Creditor Trust Agreement**: means that certain agreement governing the Creditor Trust dated as of the Effective Date, substantially in the form included in the Plan Supplement.

**9.30    Debtor and Debtor-in-Possession**: Sharity Ministries Inc., the debtor-in-possession in this Chapter 11 Case.

**9.31    Disputed Claim**: Any claim against the Debtor pursuant to Section 502 of the Code that the Debtor has in any way objected to, challenged or otherwise disputed. There shall be no distribution on Disputed Claims unless and until it becomes an Allowed Claim. To the extent a Disputed Claim becomes an Allowed Claim, such Allowed Claim shall be entitled to the distributions such holder would have received had its Claim been Allowed on the Effective Date.

**9.32    Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims.

**9.33    Effective Date**: the effective date of a chapter 11 plan is 30 days after entry of the order confirming the plan unless the plan or confirmation order provides otherwise.

**9.34    Estate**: means the bankruptcy estate of the Debtor in the Bankruptcy Case, as created under section 541 of the Bankruptcy Code.

**9.35    Equity Interest**: An ownership interest in the Debtor.

**9.36    Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

**9.37    Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**9.38    General Bar Date**: means September 6, 2021, the deadline for each person or entity, including without limitation, individuals, partnerships, corporations, joint ventures, and trusts, other than Governmental Units, to file a proof of Claim against the Debtor for a Claim that arose before the Petition Date.

**9.39    General Unsecured Claim**: means any Claim against the Debtor that is (i) not a Secured Claim, Administrative Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim, or (ii) is otherwise determined by the Bankruptcy Court to be an Unsecured Claim.

**9.40    Governmental Unit**: has the meaning set forth in section 101(27) of the Bankruptcy Code.

**9.41    Governmental Unit Bar Date**: means January 4, 2022, the deadline for Governmental Units to file a proof of Claim against the Debtor for a Claim that arose before the Petition date.

**9.42    Holder**: means the legal or beneficial owner of a Claim, and when used on conjunction with a class or type of Claim, means a Holder of a Claim in such Class or of such type.

**9.43    Impaired**: means an Allowed Claim that is Impaired within the meaning of section 1124 of the Bankruptcy Code.

**9.44    IRC**: The Internal Revenue Code.

**9.45    Member**: means any individual who qualifies for membership with Sharity, is current with Monthly Contributions, and who is eligible to submit Share Requests.

**9.46    Monthly Contributions**: means the voluntary contributions made by Members in accordance with the guidelines applicable to their respective program.

**9.47    Net Disposable Income**: means the line item "Net Disposable Income" on the projections attached hereto as Exhibit 1.

**9.48    Petition Date**: July 8, 2021, the date the chapter 11 petition for relief was filed.

**9.49    Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**9.50    Plan Supplement**: means the appendix of any schedules or exhibits that may be filed at least fourteen (14) days prior to the deadline for submission of Ballots to vote to accept or reject the Plan. The Plan Supplement will be filed with the Bankruptcy Court and served on the required notice parties and shall be made available on the Debtor's claims agent's website (https://www.bmcgroup.com/sharity).

**9.51    Pro Rata Share**: means the proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims (including Disputed Claims, but excluding Disallowed Claims) in that particular Class.

**9.52    Priority Non-Tax Claim**: means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code

**9.53    Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**9.54    Reorganized Debtor**: The Debtor after the Effective Date.

**9.55    Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

**9.56    Section 510(c) Claim**: means a Claim against the Debtor that, under principles of equitable subordination, is subordinate for purposes of distribution of all or part of an allowed claim.

**9.57    Secured Claim**: means a Claim (i) secured by Collateral, to the extent of the value of such Collateral (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and the Debtor, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**9.58    Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

**9.59    Share Request**s: are the mechanism in which Members submit the expenses of their medical services to be shared by other Members.

**9.60    Trustee**: [      ], the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

**9.61    Unsecured Creditor**: Any Creditor that holds a Claim in the Chapter 11 Case which is not a secured Claim.

[Remainder of page is intentionally blank.]

Dated: July 8, 2021                         **LANDIS RATH & COBB LLP**
Wilmington, Delaware

_/s/ Matthew B. McGuire_
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
        mcguire@lrclaw.com
        jenner@lrclaw.com

**- and -**

**BAKER & HOSTETLER LLP**
Jorian L. Rose (_pro hac vice_ pending)
Jason I. Blanchard (_pro hac vice_ pending)
Elyssa S. Kates (_pro hac vice_ pending)
New York, New York
Telephone:  212.589.4200
Facsimile:  212.589.4201
Email: jrose@bakerlaw.com
        jblanchard@bakerlaw.com
        ekates@bakerlaw.com

Andrew V. Layden (_pro hac vice_ pending)
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Facsimile:  407.841.0168
Email: alayden@bakerlaw.com

_Proposed Counsel for the Debtor and Debtor
in Possession_