# EXHIBIT B

## MANAGEMENT AND ADMINISTRATION AGREEMENT

This Management and Administration Agreement (the "**Agreement**") is effective as of August 13, 2018 (the ("**Effective Date**") by and between Aliera Healthcare, Inc., a Delaware corporation ("**Aliera**"), and Trinity HealthShare, Inc., a Delaware nonprofit corporation ("**Trinity**"). Aliera and Trinity are sometimes referred to collectively as the "**Parties**," and each individually as a "**Party**".

**WHEREAS**, Aliera develops and markets healthcare products as an alternative to traditional health insurance, with some products containing a health care sharing ministry component:

**WHEREAS**, Aliera is a program manager for health care sharing ministry plans, responsible for the development of plan designs, pricing, and marketing materials, vendor management, and recruitment and maintenance of a national sales force to market plans, including accounting and management of sales commissions to authorized marketing representatives on behalf of the ministry;

**WHEREAS**, Aliera also provides administrative services that include system administration for both membership processing systems and member ShareBox databases, enrollment processing, billing and collection of monthly share amounts from health care sharing members, maintenance of membership records, management of third party administrators responsible for the processing of medical claims forms and determining sharing eligibility, and issuance of payment to members and providers, as well as providing and maintaining an inbound call center for member services, website development and maintenance, and usual and customary management functions such as Finance, Compliance, Human Resources, Marketing, Privacy, Data Security, and Information Technology;

**WHEREAS**, Trinity has filed the Form 1023 with the Internal Revenue Service (the "**IRS**") for recognition of exemption from federal income tax under section 501(c)(3) of the Internal Revenue Code, and wishes to enter into this Agreement allowing Aliera to include Trinity's healthcare sharing ministry program (the "**HCSM**") as a component of an existing healthcare plan which Aliera offers, or as a new healthcare plan which Aliera will offer, to the general public (any plan containing or consisting of the HCSM, a "**Plan**"), which Plans are listed on **Exhibit A** (as may be amended from time to time);

**WHEREAS**, Aliera has the exclusive right to design, market and sell the HCSM to its existing members and prospective members and to provide enrollment and other administrative services relating to the HCSM, and to market the Plans, which Plans will not include insurance products and cannot be bundled with insurance;

**WHEREAS**, Trinity currently has no members in its HCSM, and the Parties intend that the members who enroll in the Plans become "customers" of Aliera, and that Aliera maintain ownership over the "**Membership Roster**," which shall include the name, contact information, social security number, type of Plan and agent information (if applicable), among other necessary information, for each member who enrolls in the Plans.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual promises and conditions contained herein, the Parties agree as follows:

1.  **Description of Services; Rights and Duties**

    a.    <u>Exclusive Rights</u>.  Trinity grants to Aliera an exclusive license to develop, market and sell the HCSM plans to individuals in the public markets who will acknowledge the standard of beliefs and other requirements as deemed necessary by Trinity, and agreed upon by Aliera. Aliera has the right to use all distribution channels for such marketing and sales; provided, however, that Aliera shall not permit brokers, field agents, general agencies or call centers to combine any insurance products with the HCSM.

    b.    <u>Product Development</u>.  Aliera will be responsible for plan design (defining the schedule of medical services eligible for sharing), and pricing of the Plans. Aliera has the right, at its sole discretion, to develop and market the HCSM (the schedule of medical services eligible for sharing under the HCSM) with other non-insurance health care products that are developed and managed by Aliera as an "**Aliera Product**" and included in the same Plan. Aliera also has the sole right and discretion to determine whether a Plan also includes one or more Aliera Products.

    c.    <u>Marketing</u>.  Aliera will (i) create any and all marketing materials used to market the Plans pursuant to this Agreement, and (ii) market and sell, through its authorized representatives, the Plans (the "Services"). Trinity authorizes Aliera and its authorized marketing representatives to discuss with potential members the prices, terms and conditions for the HCSM, and to provide explanations of the HCSM. Aliera, and its authorized marketing representatives will provide information to potential members regarding the faith and lifestyle requirements for the HCSM, as well as information necessary for potential members to understand that the Plans are not insurance.

    d.    <u>Enrollment; Acceptance of Subscriptions of Members; Ownership of Membership Roster</u>.  Aliera (or its representatives or agents) will enroll new members in the Plans. Aliera is authorized to accept any enrollment from members in the Plans in its sole discretion. Aliera acknowledges and understands that, in order for members to qualify for participation in a healthcare sharing ministry, Aliera may only accept subscriptions from members who will acknowledge the standard of beliefs and other requirements as deemed necessary by Trinity and agreed upon by Aliera.  Trinity acknowledges and agrees that. because Aliera is the sole party developing and marketing the Plans (including the HCSM component) and making the sole effort to develop members, Aliera has exclusive ownership rights to the Membership Roster, and Trinity is not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera.

    e.    <u>Changes by Members</u>.  Members who are enrolled in any Plan are permitted to change components of Plans as directed by Aliera. Aliera is authorized, in its sole discretion, to transfer members to different Plans if members request such change in writing, and may substitute any component of a Plan, including the HCSM, upon notice to the members of any Plan. Aliera will notify Trinity when it has made a substitution of the HCSM component of a Plan at a member's request.

f.    Medical Expense Processing.  Aliera will enter into a third party administrative services agreement with a third party administrator, which may be an affiliate of Aliera (the "TPA"), pursuant to which the TPA provides account management and medical expense processing services for the Plans, as specifically described in such agreement.  So long as such agreement or other similar agreement is in effect, Aliera shall have no obligation to provide account management and medical expense processing services for the HCSM.  In addition, Aliera may engage other third party administrative service providers in connection with the Plans or this Agreement.  In addition, Aliera may direct the TPA to use the services of other providers or service providers in order to enhance members' experiences, contain costs, or provide services that the TPA may not be qualified to provide.

g.    Medical Expense Funding.  Aliera and Trinity agree that each Party will distribute amounts to the ShareBox account for members to fund future member medical expense payments in accordance with **Exhibit B** attached hereto.  The Parties may amend **Exhibit B** without amending this Agreement.

h.    Financial Reporting.  Trinity is responsible for providing and paying for accounting staff to support the financial operations necessary for the HCSM.  Trinity hereby delegates this responsibility to Aliera, and Aliera agrees to provide such accounting staff and financial operations support, including monthly financial and membership reporting, audit support and Form 990 tax filing support as part of the Services.

i.    Tax Filings; Audits.  The Parties agree to have simultaneous Audits performed by the same mutually agreed upon audit firm for each calendar year end.  This cooperation to engage certified public accountants and auditors is specifically encouraged to timely prepare and file Trinity's Form 990s and perform required audits relating to the HCSM, as required (including required time frames) under IRS rules applicable to 501(c)(3) organizations and health care sharing ministries.  Each Party is responsible for its own expenses in connection with any tax filings or audits.  Each Party shall make available to the certified public accountants and auditors, upon reasonable and advance request, all books and records required to be reviewed in connection with any tax filings or audits.

j.    Compliance with Non-Profit Laws.  Trinity has the sole responsibility to determine the requirements applicable to it as a non-profit organization.

k.    Trinity Board.  The board of directors of Trinity shall be selected by Trinity.  At all times during the Term of this Agreement, no more than one-third of the board of directors of Trinity will consist of directors who are current directors, officers, employees, agents or stockholders of Aliera.  Trinity has the sole responsibility and obligation to determine when board actions are required, and Aliera has no responsibility to assist or advise Trinity regarding any of its internal governance matters.  Notwithstanding the foregoing, the Trinity board shall not take any actions that will cause it to violate this Agreement, Aliera's rights under this Agreement, or negatively affect the interests of the members of the Membership Roster.

2.    **Intellectual Property**

   a.    <u>License of Trinity Name</u>.  Trinity hereby grants to Aliera a non-exclusive, non-transferable, and non-sublicensable license to use Trinity's trademarks, logos, and other brand indicia (collectively, "**Brand Indicia**") of Trinity (the "**Trinity Marks**") during the Term, on or in connection with the marketing, promotion, advertising, and sale of the Plans. Upon reasonable written request from Trinity, Aliera will discontinue the display or use of the Trinity Marks or change the manner in which one or more Trinity Marks are displayed or used, provided that Aliera shall have no obligation to destroy existing inventory of materials as a result of a change in the Trinity Marks, but only to replace such inventory with the revised versions of the Trinity Marks when such inventory is depleted. Aliera acknowledges and agrees that any and all goodwill arising as a result of Aliera's use of the Trinity Marks shall inure to the benefit of Trinity, and Aliera acquires no rights in or to the Trinity Marks other than the license specifically set forth in this Agreement. Trinity shall not have a right or license to use the Aliera Brand Indicia.

   b.    <u>Intellectual Property Defined</u>.  "**Intellectual Property**" means any and all methods, processes, procedures, inventions (regardless of patentability), ideas, designs, concepts, technique, discoveries, improvements, software code, algorithms, works of authorship, work product or moral rights, as well as any trademarks, service marks, copyrights, copyright applications, rights in copyrightable works, trade secrets, know-how and other confidential or proprietary information, patents, patent applications, any divisionals, continuations, continuations-in-part, reissues, extensions, or reexaminations thereof, and any other intellectual property rights or other proprietary rights in any country or jurisdiction throughout the world.

   c.    <u>Background Intellectual Property</u>.  "**Background IP**" means any Intellectual Property conceived, developed, created or discovered prior to or outside the scope of this Agreement.

   d.    <u>Trinity Intellectual Property</u>.  Subject only to the rights expressly granted in this Agreement, Trinity owns and shall retain ownership of all Trinity Background IP.  In addition, subject only to the rights and licenses expressly granted in this Agreement, Trinity will solely own all right, title and interest in any Intellectual Property conceived, developed, created or discovered solely by Trinity personnel or contractors in the performance of this Agreement (the "**Trinity Intellectual Property**").

   e.    <u>Aliera Intellectual Property</u>.  Subject only to the rights expressly granted in this Agreement, Aliera owns and shall retain ownership of all Aliera Background IP.  In addition, subject only to the rights and license granted in this Agreement, Aliera will solely own all right, title and interest in any Intellectual Property conceived, developed, created or discovered solely by Aliera personnel or contractors in the performance of this Agreement (the "**Aliera Intellectual Property**"). Without limiting the foregoing, Aliera Intellectual Property shall specifically include all plan designs, marketing materials, plan concepts, pricing structure, the Membership Roster, software systems to manage said plans and all Intellectual Property associated with the plans designed and implemented by Aliera, even if said items bear the Brand Indicia or Trinity Marks. Neither the use of the Brand Indicia nor the Trinity Marks in the Aliera Background IP or the Aliera Intellectual Property will grant Trinity any rights in or to the Aliera Background IP or the

Aliera Intellectual Property other than the ownership in and to the Brand Indicia and the Trinity Marks that Trinity holds as Trinity Background IP.

   f.    **Joint Intellectual Property**.  Trinity and Aliera will jointly own any and all Intellectual Property conceived, developed, created or discovered jointly by personnel or contractors of both Trinity and Aliera (the "**Joint Intellectual Property**").  Aliera and Trinity will coordinate with each other to determine whether it is appropriate to file for any intellectual property protections for the Jointly Developed Intellectual Property, and both Aliera and Trinity will each have the right to exploit the Jointly Intellectual Property without accounting to the other, provided that such exploitation does not violate other provisions of this Agreement.

   g.    **No Other Licenses**.  For the avoidance of doubt, other than the express licenses granted by this Agreement, none of the Parties grant any rights or licenses to their Intellectual Property, by implication, estoppel, or otherwise, to the other Parties.

3.    **Revenue and Expenses; Payments**

   a.    **Revenues and Expenses**.  Trinity and Aliera have agreed to apportion the total revenues received from the member share contribution amounts and the vendor fees associated with the Plans in accordance with **Exhibit B** attached hereto, which may be amended from time to time as agreed to by the Parties (the "**Revenue and Expense Structure**").  For clarity, the Parties may amend the Revenue and Expense Structure by amending **Exhibit B** only, without amending this Agreement.  No person who is a "disqualified person" under IRS rules and regulations will be paid any fees by the other Party.

   b.    **Enrollment Fees**.  Trinity will receive $25 for each application to be paid from each member's enrollment fees (the "**Member Enrollment Fees**") in any of the Plans.

   c.    **Member Payments**.  All member share contributions (the monthly share amount that each member contributes for each of the Plans) and Member Enrollment Fees will be first paid directly to a banking account in the name of Aliera.  Aliera will transfer the funds attributable to the HCSM portion of the Plans into a banking account in the name of Trinity, which funds will be the net amount after any payments due from Trinity, in accordance with the Revenue and Expense Structure and the Share Box Contribution, have been distributed by Aliera.  Aliera will provide Trinity with a report within 15 days of the end of each month showing the amounts attributable in that month to the HCSM portion of the Plans, and the deductions made from such amounts in accordance with the Revenue and Expense Structure.

   d.    **Payments**.  Pursuant to resolutions of the board of directors of Trinity, Aliera is an authorized signatory, and is authorized to make payments from, each and all banking accounts opened in Trinity's name in connection with this Agreement.  Aliera is authorized to make, or cause to be made, deposits into, and payments from, such Trinity banking accounts, in accordance with the Revenue and Expense Structure.

4.    **Representations and Warranties**

Each Party represents and warrants to the other that (i) it has the full authority and power to enter into and fully perform this Agreement; (ii) neither the execution nor delivery of this Agreement, nor such Party's performance of any obligations under this Agreement, will conflict with or violate any other license, agreement or commitment by which such Party is bound; and (iii) it will perform its obligations under this Agreement in compliance with all applicable laws and regulations.

5.    **Termination**

a.    <u>Term</u>.  This Agreement shall become effective on the Effective Date and shall continue in force until the fifth (5th) anniversary of the Effective Date (the "**Initial Term**"), and will automatically, without further action by either Party, renew for an additional five (5) years ("**Renewal Term**", and each Renewal Term together with the Initial Term, the "**Term**"), unless either Party delivers to the other Party written notice of its intent not to renew at least 270 days prior to the expiration of the Initial Term or the then current Renewal Term, as applicable.

b.    Termination Upon Default.  Either Party may terminate this Agreement, effective on written notice to the other party (the "**Defaulting Party**"), if the Defaulting Party:

i.    Materially breaches this Agreement, and either such material breach is incapable of cure or, if curable, the Defaulting Party does not cure such breach within 30 days after receipt of written notice of such breach;

ii.    Becomes insolvent or admits its inability to pay its debts generally as they become due, makes a general assignment for the benefit of creditors, voluntarily enters into an proceeding under any bankruptcy or insolvency law, becomes involuntarily subject to any such proceeding which is not dismissed or vacated within 45 days after filing, or has a receiver or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

iii.    Is dissolved or liquidated or takes any corporate action for such purpose.

c.    <u>Post-Termination Matters</u>.  Neither Party shall incur any liability to the other by reason of the termination of this Agreement or its non-renewal; provided, however, that the termination of this Agreement for any reason shall not terminate any rights, obligations or liabilities which either Party may accrue prior to such expiration or termination.  Upon valid termination of this Agreement, all rights and authority granted hereunder shall immediately terminate (except as provided below), and the Parties will promptly destroy or return all materials in its possession which belong to the other Party, including any and all confidential information which may have come into its possession as well as any and all materials bearing the Brand Indicia or containing the Intellectual Property of the other Parties. In the event of any termination of this Agreement, Sections 1(d), 7, 8 and 9 will survive in accordance with their terms.

    d.    <u>Active Members</u>.  Upon termination of this Agreement in accordance with this Section, any existing member enrolled in a Plan will remain active and continue to be serviced by Aliera until the member requests cancellation of the Plan.

6.    <u>**Indemnification & Limitations**</u>

    a.    <u>Indemnification</u>. Each party shall agree to defend, hold harmless and expeditiously indemnify the other party of and from any and all liability, claim, loss, damage, or expense arising from or in connection with the indemnifying Party's breach or violation of any representation, warranty or covenant contained in this Agreement (if such breach of representation, warranty or covenant is decided by a court of competent jurisdiction, arbitration or by admission of either party). including reasonable attorneys' fees and expert witness fees and other reasonable costs incurred in the defense of any legal proceeding asserting such a claim.

    b.    <u>Limitations</u>.    EXCEPT FOR (i) A PARTY'S BREACH OF ITS CONFIDENTIALITY AND NON-SOLICITATION OBLIGATIONS SET FORTH IN SECTION 7 AND (ii) A PARTY'S INDEMNITY OBLIGATIONS SET FORTH IN SECTION 6, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL. CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT. WHETHER LIABILITY IS ASSERTED IN CONTRACT OR TORT, AND REGARDLESS OF WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE THIS SECTION DOES NOT LIMIT EITHER PARTY'S LIABILITY FOR BODILY INJURY (INCLUDING DEATH). OR PHYSICAL DAMAGE TO TANGIBLE PROPERTY. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, EXCEPT AS PROVIDED FOR A BREACH OF SECTION 7 (CONFIDENTIALITY AND NON-SOLICITATION OBLIGATIONS) OR EXCEPT AS PROVIDED UNDER SECTION 6 (INDEMNITY OBLIGATIONS), IN NO EVENT SHALL EITHER PARTY'S TOTAL LIABILITY TO THE OTHER PARTY IN CONNECTION WITH. ARISING OUT OF OR RELATING TO THIS AGREEMENT EXCEED $5,000 (USD). THE PARTIES AGREE THAT THE LIMITATION SPECIFIED IN THIS SECTION WILL APPLY EVEN IF ANY LIMITED REMEDY PROVIDED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

7.    <u>**Confidential Information; Non-Solicitation**</u>

    a.    <u>Confidential Information</u>.

        i.    <u>Definition</u>. From time to time during the Term of this Agreement. either Party (in such capacity, the "**Disclosing Party**") may, but is not hereby obligated to, disclose or make available to the other Party (in such capacity, the "**Receiving Party**") proprietary information of the Disclosing Party. including information about its business. products and services, ownership structure, financial condition, operations, assets, liabilities, business plans, Aliera Intellectual Property, information that it deems a trade secret under applicable law, third-party confidential information in the Disclosing Party's possession or under its control, and other sensitive or proprietary information, and all notes, documents and other materials prepared by the Receiving Party that contain, reflect or are based upon any such information described above, in each case whether orally or in

writing, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" (collectively, "**Confidential Information**").

ii.      Exclusions. Confidential Information shall not include information that, at the time of disclosure and as established by the Receiving Party by documentary evidence: (i) was already possessed by the Receiving Party prior to its being obtained in connection with the Services, free of other confidentiality obligations to the Disclosing Party, (ii) has become generally available to the public other than as a result of disclosure by the Receiving Party or any of its affiliates or representatives, or (iii) has become available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party, where the Receiving Party has no knowledge, after reasonable inquiry, that the source owes any confidentiality obligation to the Disclosing Party.

iii.      HIPAA. Trinity acknowledges that Aliera may determine, with advice of counsel, that Aliera is subject to (i) the Health Insurance Portability and Accountability Act of 1996, and regulations promulgated thereunder, including the Privacy, Security, Breach Notification and Enforcement Rules at 45 CFR Parts 160 and 164, and any subsequent amendments or modifications thereto, and (ii) the HITECH Act, and regulations promulgated thereunder, and any subsequent amendments or modifications thereto (together, "HIPAA"). As such, Trinity shall not use PHI (as defined below) in any manner except for the purpose of performing functions, activities, or services pursuant to the Agreement; provided, however, that Trinity shall not use PHI in any manner that would constitute a violation of HIPAA if so used by Aliera. Trinity may use PHI: (i) for the proper management and administration of Trinity; (ii) to carry out the legal responsibilities of Trinity; or (iii) as required by 45 CFR § 164.103. "PHI" shall have the meaning set forth in 45 CFR § 160.103, including, without limitation, any information, whether oral, electronic or recorded in any form or medium: (i) that relates to the past, present or future physical or mental condition of an individual; (ii) the provision of health care to an individual; or (iii) the past, present or future payment for the provision of health care to an individual; and (iv) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

iv.      Duties. The Receiving Party shall protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; shall not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise the Receiving Party's rights or to perform its obligations under this Agreement; and shall not disclose any such Confidential Information to any person or entity, except to the Receiving Party's representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under the Agreement.

v.      Obligation for Representatives. The Receiving Party shall be responsible for any breach of this Section 7(a) caused by any of its representatives. At the Disclosing Party's written request, the Receiving Party shall promptly return, and shall require its

representatives to return to the Disclosing Party all copies, whether in written, electronic or other form or media, of the Disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the Disclosing Party that such Confidential Information has been destroyed. The Disclosing Party's Confidential Information shall be protected throughout the Term of this Agreement and for five (5) years following termination of this Agreement.

b.     <u>Non-Solicitation</u>. During the Term and for two (2) years after, each Party shall not, and shall not assist any other person to, directly or indirectly, recruit or solicit for employment or engagement as an independent contractor any person then or within the prior six (6) months employed or engaged by the other Party.

c.     <u>Remedies</u>. In addition to all other remedies available hereunder or otherwise at law, each party may seek equitable relief (including injunctive relief) against the other party and its representatives to prevent the breach or threatened breach of <u>Section 7</u> of this Agreement and to secure enforcement thereof, without need to prove actual damages or to post bond or other security.

8.     <u>Governing Law; Venue; Waiver of Jury Trial</u>

This Agreement shall be enforced, governed and construed in accordance with the laws of the State of Georgia, without regard to its principles governing the conflict of laws. Any judicial proceedings brought by either Party hereto must be brought in either the state or (if jurisdiction can be acquired) federal courts located in Fulton County, Georgia, and each Party consents to such venue serving as the exclusive venue for any such actions.

THE PARTIES HEREBY IRREVOCABLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

9.     <u>Miscellaneous</u>

a.     <u>No Joint Venture</u>. The relationship of the Parties is that of independent contractors. This Agreement does not give either Party the power to direct the day to day activities of the other, constitute the Parties as partners, joint venturers, co-owners or principal-agent, or allow either Party to create or assume any obligation on behalf of the other Party.

b.     <u>Records</u>. The Parties agree to maintain all documents and records relating to members in the Plans for the earlier of five (5) years following the (i) cancelation of such member's enrollment in any Plan, or (ii) termination of this Agreement. Each Party agrees to permit the other Party (at the requesting Party's sole expense) to have reasonable access, at reasonable times and in a manner so as not to unreasonably interfere with normal business operations, to such documents and records so as to enable each Party to prepare tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of governmental authorities, and to prosecute and defend legal actions or for other like purposes.

c.      Assignment.  This Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the parties. No Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party, and any purported assignment by any Party in violation of this provision will be null and void.  Notwithstanding the foregoing, a Party may assign this Agreement to a person or entity that controls, is controlled by, or is under common control with the Party. A Party agrees to provide the other Party with at least 60 days' prior written notice in the change of ownership. control. substantial change in management or management rules and regulation of operations.

d.      Severability.  If any provision of this Agreement is determined by a court to be unenforceable, then the parties shall deem the provision to be modified to the extent necessary to allow it to be enforced to the extent permitted by law, or if it cannot be modified, the provision will be deleted from this Agreement. and the remainder of the Agreement will continue in effect.

e.      Entire Agreement.  This Agreement contains the entire understanding between the Parties with respect to the subject matter hereof and supersedes all and any prior understandings, undertakings and promises between Trinity, and Aliera whether oral or in writing.

f.      Joint Negotiation.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  The Parties contemplate that this Agreement will be construed as having been drafted jointly by the Parties. and no presumption or burden of proof will arise favoring or disfavoring any party based upon the authorship of any provision hereof.  Trinity acknowledges that Aliera's legal counsel does not represent and has not represented Trinity in connection with, including the negotiation of, this Agreement, and that it had the opportunity to retain its own counsel in connection with this Agreement.

g.      Notices.  Any notice, request or consent required or permitted hereunder must be in writing and will be deemed to have been received when hand delivered, when sent by email or fax (upon electronic confirmation of error-free delivery), one day after being sent by nationally recognized overnight courier. costs prepaid, or three days after being sent by certified or registered U.S. mail. return receipt requested, postage prepaid, in any case addressed to the recipient at its contact information listed below (or at such other address as the applicable party may designate by notice hereunder to the other parties):

> To:   Trinity HealthShare, Inc.
>       5901 Peachtree Dunwoody Rd., Suite C 160
>       Atlanta, GA  30328
>       Attn: William H. Thead, III, Chairman
>
> To:   Aliera Healthcare, Inc.
>       990 Hammond Drive
>       Suite 700
>       Atlanta. Georgia 30328
>       Attn: Chase Moses, Executive Vice President

13066999 v 10                                     10

h.     <u>No Waiver</u>.  No failure or delay by any party to exercise any right under this Agreement will operate as a waiver of such right. and no single or partial exercise of any such right will preclude any other or further exercise of such right or the exercise of any other right.

i.     <u>Multiple Parts</u>.  This Agreement may be signed in counterparts, by facsimile and electronic signatures, and by signatures delivered electronically, each of which will be deemed an original and all of which together will constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS, WHEREOF, and intending to be legally bound hereby, the Parties have executed this Agreement under seal as of the date first written above.

**ALIERA HEALTHCARE, INC.**

By:

Name:  Chase Moses
Title:    Executive Vice President

**TRINITY HEALTHSHARE, INC**

By:

Name:  William Thead, III
Title:    Chairman

*Signature Page to Services Agreement*

**EXHIBIT A**

**List of Plans**

AlieraCare    contains both Aliera and Trinity healthcare components

Interim Care    contains both Aliera and Trinity healthcare components

CarePlus    contains Trinity healthcare components only

Trinity Dental and Vision - contains Trinity healthcare components only

PrimaCare    contains Trinity healthcare components only

AD&D - TBD

Critical Illness - TBD

Accident    TBD

Hospital Indemnity - TBD

## EXHIBIT B

## Revenue and Expense Structure

Pursuant to that Management and Administration Agreement dated as of August 13, 2018, by and between Aliera and Trinity, the parties agree that the revenues received from the Plans, and the costs and expenses associated with the Plans, shall be allocated to each of Aliera and Trinity as set forth below or attached, until amended or changed by mutual agreement of the parties. Aliera will obtain a valuation from an independent appraiser to ensure the payments from Trinity to Aliera for Aliera's services under the Agreement are fair market value for purposes of Internal Revenue Service (IRS) rules and regulations governing excess benefit transactions in connection with non-profit organizations. Payments from Trinity to Aliera for reimbursement of vendor costs will not be considered payment of services to Aliera.

### AlieraCare & InterimCare

Trinity acknowledges and agrees that Aliera will receive and retain 65% of the total member share contribution for each primary member of each of the AlieraCare and Interim Care plans (the "**Total Side by Side MSC**") for the Aliera components of each plan and as payment for the Services.

Trinity will receive 35% of the Total Side by Side MSC (the "**Trinity MSC**"). Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the AlieraCare and Interim Care plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses<br>Side by Side Products | % of Trinity MSC |
|---|---|
| Aliera Mgmt Fee General Overhead Ops Labor Internal Sales | 19.6% |
| Commissions | 30.0% |
| TPA Fees | 2.6% |
| Provider Network (Multi Plan) | 1.2% |
| Telemedicine | 0.8% |
| Total Reimbursement | 54.2% |
| ShareBox Contribution  Side by Side Products | % of Trinity MSC |
| ShareBox Member Reserve | 44.3% |

### CarePlus

The Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of each of CarePlus plans (the "**MSC**"), and potentially in the future, for the Hospital Indemnity, Critical Illness and AD&D Plans contemplated under Exhibit A . Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the CarePlus plans (and potentially in the future, for the Hospital

Indemnity, Critical Illness and AD&D Plans), as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses<br>Stand Alone products | % of MSC |
|---|---|
| Aliera Mgmt. Fee General Overhead Ops Labor Internal Sales | 20.0% |
| Commissions | 35.0% |
| TPA Fees | 2.5% |
| Provider Network (Multi Plan) | 1.2% |
| Telemedicine | 1.0% |
| Total Reimbursement | 59.7% |
| Share Box Contribution   Stand Alone Products | % of MSC |
| Share Box Member Reserve | 35% |

## PrimaCare

The Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of each of PrimaCare (the "**PrimaCare MSC**"). Trinity will reimburse Aliera, from such amounts, the following fees in the following percentages for Aliera's payment of vendor cost for the PrimaCare plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses<br>Stand Alone products | % of PrimaCare MSC |
|---|---|
| Aliera Mgmt. Fee General Overhead Ops Labor Internal Sales | 30.0% |
| DPCMH Concierge Services | 15.5% |
| Commissions | 40.0% |
| TPA Fees | 2.5% |
| Provider Network (Multi Plan) | 1.2% |
| Telemedicine | 1.0% |
| Total Reimbursement | 90.20% |
| Share Box Contribution   Stand Alone Products | % of PrimaCare MSC |
| Share Box Member Reserve | 8.3% |

## Dental

The Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of each of Dental plans (the "**Dental MSC**"). Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the Dental plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses<br>Stand Alone products | % of Dental MSC |
|---|---|
| Aliera Mgmt. Fee General Overhead Ops Labor Internal Sales | 30.0% |
| Commissions | 40.0% |
| TPA Fees | 2.5% |
| Provider Network (Multi Plan) | 10% |

| | |
|---|---|
| Total Reimbursement | 82.5% |
| Share Box Contribution   Stand Alone Products | % of Dental MSC |
| Share Box Member Reserve | 15% |

## Vision

Further, the Parties agree that Trinity will receive 100% of the total member share contribution for each primary member of the Vision plans (the "**Vision MSC**"). Trinity will reimburse Aliera, from such amount, the following fees in the following percentages for Aliera's payment of vendor cost for the Vision plans, as well as distribute the following amounts to the ShareBox account to be used solely for member medical expense payments.

| Program Expenses<br>Stand Alone products | % of Vision MSC |
|---|---|
| Aliera Mgmt. Fee General Overhead Ops Labor Internal Sales | 30.0% |
| Commissions | 40.0% |
| TPA Fees | 2.5% |
| Provider Network (Vision Fees) | 10% |
| Total Reimbursement | 82.5% |
| Share Box Contribution   Stand Alone Products | % of Vision MSC |
| Share Box Member Reserve | 15% |