## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SHARITY MINISTRIES, INC.,[1]<br><br>    Debtor. | Chapter 11<br><br>Bankruptcy Case No. 21-11001 (JTD) |
| OFFICIAL COMMITTEE OF MEMBERS<br>OF SHARITY MINISTRIES, INC.,<br><br>        Plaintiff,<br><br>vs.<br><br>THE ALIERA COMPANIES, INC., a<br>Delaware corporation; ADVEVO, LLC, a<br>Delaware limited liability company;<br>ENSURIAN AGENCY, LLC, a Delaware<br>limited liability company; TACTIC EDGE<br>SOLUTIONS, LLC, a Delaware limited<br>liability company; and USA BENEFITS &<br>ADMINISTRATORS, LLC, a New Mexico<br>limited liability corporation,<br><br>        Defendants. | Adversary Case No. _____<br><br>COMPLAINT FOR AVOIDANCE OF<br>FRAUDULENT TRANSFER, FRAUD AND<br>MISREPRESENTATION, BREACH OF<br>FIDUCIARY DUTY, AIDING AND<br>ABETTING BREACH OF FIDUCIARY<br>DUTY, CONVERSION, AND UNJUST<br>ENRICHMENT |

## <u>ADVERSARY COMPLAINT</u>

### I.    PARTIES

1.      Plaintiff OFFICIAL COMMITTEE OF MEMBERS OF SHARITY MINISTRIES,

INC. was appointed pursuant to 11 U.S.C. §§ 1181(b) and 1102(a)(2) and this Court's August 12,

2021 Order. D.I. 144. Plaintiff brings this action derivatively on behalf of and for the benefit of

the bankruptcy estate, pursuant to this Court's Order dated November 22, 2021. D.I. 305. The

Debtor has consented to the filing of this Adversary Complaint pursuant to that Order. *Appendix 9.*

---

[1] The last four digits of the Debtor's federal tax identification number is 0344. The Debtor's
mailing address is 821 Atlanta Street, Suite 124, Roswell, GA 30075.

The bankruptcy estate of nonprofit Sharity Ministries, Inc., in turn, has associational standing to assert the collective, non-individualized claims of its members, which claims Plaintiff also asserts. Debtor Sharity Ministries, Inc. was formerly known as Trinity Healthshare, Inc. and is referred to in this Complaint as "Trinity" or "Sharity."

2.      Defendant THE ALIERA COMPANIES, INC. ("Aliera") is a Delaware corporation headquartered in Atlanta, Georgia. It is incorporated as a for-profit business, without any express religious affiliation. It changed its name in 2019 from Aliera Healthcare, Inc.

3.      Defendant ADVEVO, LLC ("Advevo") is a Delaware limited liability company with its headquarters in Atlanta, Georgia. It is a wholly owned subsidiary of Aliera.

4.      Defendant ENSURIAN AGENCY, LLC ("Ensurian") is a Delaware limited liability company with its headquarters in Atlanta, Georgia. It is a wholly owned subsidiary of Aliera.

5.      Defendant TACTIC EDGE SOLUTIONS, LLC ("Tactic Edge") is a Delaware limited liability company with its headquarters in Atlanta, Georgia. It is a wholly owned subsidiary of Aliera.

6.      Defendant USA BENEFITS & ADMINISTRATORS, LLC ("USA Benefits") is a New Mexico limited liability company with its headquarters in Atlanta, Georgia. It is a wholly owned subsidiary of Aliera.

7.      Defendants Advevo, Ensurian, Tactic Edge, and USA Benefits are collectively referred to as Aliera "Subsidiaries."

## II.   JURISDICTION AND VENUE

8.      This is an action for recovery of funds paid by the more than 60,000 members of Debtor Sharity Ministries, Inc. The members made payments on the assurance that medical expenses they might incur would be covered under the Sharity health care plans. Instead, the

members' payments were fraudulently, and in breach of fiduciary duties, transferred to Defendant Aliera and its Subsidiaries, rendering the Debtor insolvent and unable to pay the members' medical expenses. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 152, 153, 157, and 1334.

9.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(E) and (F).

10.     Pursuant to Bankruptcy Rule 7008, this adversary proceeding relates to the Chapter 11 case styled *In re Sharity Ministries, Inc.,* Case No. 21-11011 (JTD), pending in this Court. Accordingly, this action is properly brought as an adversary proceeding pursuant to Bankruptcy Rule 7001(1) and 11 U.S.C. §§ 544(b)(1), 547, 548 and 550.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

### III.   NATURE OF THE CASE

12.     When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing Health Care Sharing Ministries ("HSCMs"). In order to qualify as an HSCM under the ACA, an entity must meet the following rigid requirements:

(1) it must be recognized as a 501(c)(3) tax exempt organization;

(2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs";

(3) its members must "retain membership even after they develop a medical condition";

(4) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999"; and

(5) it must be subject to an annual audit by an independent CPA and make that audit

available to the public upon request.

26 U.S.C. § 5000A(d)(2)(B)(ii). The reason for the 1999 cutoff date was to ensure the reliability

of care that comes with historical practice, and to prevent "opening the flood gate" to groups

seeking to circumvent the requirements of the ACA. *Liberty Univ. v. Lew,* 733 F.3d 72, 102 (4th

Cir. 2013).

13.     The founders of Aliera exploited that exception by creating and controlling Sharity

as a purported nonprofit health care sharing ministry ("HCSM") and using Sharity as a vehicle to

sell health care plans that looked like cheaper versions of genuine health insurance to vulnerable

people needing health insurance, who paid Sharity hundreds of millions of dollars in monthly

premiums and incurred hundreds of millions of dollars in medical bills, much of which has gone

unpaid.

14.     Sharity was created merely as a shell that Aliera controlled. Aliera created,

marketed, and administered the health plans sold under the Trinity or Sharity name. As the sole

point of contact with Sharity's members, Aliera directly received the members' monthly payments

and decided how much, if anything, would be paid on members' claims.

15.     Through a series of contracts that were highly favorable to Aliera or its

Subsidiaries, but highly *un*favorable to Sharity and its members ("Aliera Contracts"), Aliera

siphoned off as much as 84% of the members' payments for its own use and to funnel to its insiders.

The amounts it siphoned off should have been used to pay the members' medical expenses. Instead,

Aliera took that money and used it for its own benefit and that of its owners, while at the same

time denying the health coverage for which the members paid.

16.     As a result of these one-sided contracts that were not negotiated at arm's length, Sharity was left unable pay the members' medical expenses. In other words, Aliera created and controlled Sharity in a manner that assured its inevitable demise, and that assured that its members would be left out in the cold with tens or even hundreds of thousands of dollars of unpaid medical bills for which many of the service and care providers are now pursuing the individual members.

17.     Sharity never could have qualified as a legitimate HCSM under the federal statute because it was not created, and had no members, until long after the statutory 1999 cutoff date. By falsely claiming Sharity was an HCSM, however, Aliera claimed to be exempt from state insurance regulations that protect insureds from precisely the kind of debacle that members experienced here.

18.     State insurance regulators, however, saw it differently. Multiple state regulators have brought actions against Aliera and/or Sharity for selling unauthorized insurance policies, and finding Sharity could never have qualified as a legitimate HCSM. Unfortunately for members, however, regulatory action did not stop members from spending $362,799,502 in monthly "contribution" payments and upfront fees, and incurring at least $317,923,820 in medical bills that went unpaid.

## IV.   FACTS

### A.     Aliera Seeks Out an HCSM to Avoid Insurance Requirements, but its First Relationship Ends in Litigation

19.     Defendant Aliera was incorporated in the State of Delaware by Timothy Moses, a convicted felon, his wife, Shelley Steele, and their son Chase Moses in December 2015. Before forming Aliera, Timothy Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury. As a result of the case, titled *United States v. Moses*, 1:04-cr-00508-

CAP-JMF (N.D. Ga.), Timothy Moses was sentenced to over six years in prison and ordered to pay $1.65 million in restitution.

20.    Aliera is a for-profit entity. Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders…." Aliera's formation documents do not include any discussion of religious or ethical purposes or missions.

21.    Aliera began selling its health care products in late 2015. At the time it was formed, it only sold "direct primary care medical home (DPCMH)" plans. DPCMH plans generally cover limited services such as some doctors' visits and basic lab services. These plans provide no hospitalization or emergency room coverage and are not ACA-compliant.

22.    Aliera realized it could greatly increase the sales of its health care products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSM coverage from the ACA's individual mandate. It realized also that it could avoid insurance laws in many states that also have an exemption or "safe harbor" statute from insurance regulations for entities that meet those states' HCSM requirements.

23.    Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity located in Virginia. Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") as an HCSM that had met the requirements under 26 U.S.C. § 5000A.

24.    In 2016, Timothy Moses convinced Anabaptist to permit Aliera to market its DPCMH plan "side by side" with Anabaptist's sharing program using Anabaptist's HCSM

designation. Anabaptist created a wholly owned subsidiary, called Unity Healthshare ("Unity"), for that purpose. Under the proposal, Aliera would market both its own plan and the Unity HCSM together as a health care product it claimed would be an HCSM.

25.     Aliera entered into a contract with Unity on or about February 1, 2017. Under that contract, Aliera would offer to the public its own health care products that did not meet the insurance benefits and coverages requirements under the ACA, and that did not independently qualify for the HCSM exemption in 26 U.S.C. § 5000A. In return, Aliera's customers would join the Unity HCSM, increasing the membership in Anabaptist's HCSM. Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were supposed to be reserved for payment of benefits to Unity members.

26.     Although Aliera marketed the plans to consumers throughout the country as HCSM plans through Unity, in reality, Unity was merely a shell with an HCSM designation, through which Aliera, a for-profit entity that was never an HCSM, could push its own DPCMH plans, while also designing, marketing, selling, administering, and controlling the Unity-branded HCSM plans. Members made payments for both components of the plan directly to Aliera, and Aliera unilaterally determined how much of the payment was designated for the Aliera component, what portion was designated for the Unity component of the plan, and how much of the payment would be used to actually pay members' medical expenses.

27.     In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Timothy Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits. It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

28.     Unity terminated the relationship with Aliera in summer 2018. A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County, Georgia in late 2018 styled *Aliera Healthcare v. Anabaptist Health Share, et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.) ("Georgia Lawsuit"). The court found that administrative fees paid to Aliera under its agreement with Unity amounted to millions of dollars. Indeed, Aliera's employee testified in the Georgia Lawsuit that Aliera earned more than $180,000,000 in revenue in 2018 alone.

**B.      Aliera Created Trinity as a Sham Health Care Sharing Ministry to Avoid ACA Requirements and State Insurance Regulation**

29.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM through which to sell its health care plans. Aliera and its principals therefore created Trinity Healthshare, Inc. on June 27, 2018, as a purported Delaware nonprofit entity. William Rip Thead, III became the CEO of Trinity. Mr. Thead was an Aliera employee at the time it created Trinity. He is also a close family friend of the Moses family and officiated at Chase Moses's wedding. There were only two board members of Trinity at the time of its founding — Mr. Thead and his brother David R. Thead. On information and belief, neither Mr. Thead nor his brother had any experience running a nonprofit organization.

30.     Aliera's law firm, Burr & Forman, filed an application with the IRS for recognition of Trinity as a 501(c)(3) charitable organization and was authorized as power of attorney on behalf of Trinity in connection with that application. The application, signed by William Thead as Trinity's chairman, failed to disclose the anticipated financial arrangement with Aliera, his employer.

31.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale, and administration of the purported HCSM plans they created ("2018

Agreement"). The 2018 Agreement was drafted by Aliera and its agents and was not an arm's length transaction. It was signed by Chase Moses on behalf of Aliera and by William Thead on behalf of Trinity. The 2018 Agreement allowed Aliera to use Trinity's nonprofit status to sell health care plans purporting to be HCSM plans, and to maintain complete control over design of the plans, the money collected, the administration of the plans, the benefits paid, and the membership roster. Under the 2018 Agreement, Trinity delegated to Aliera authority to provide accounting staff, financial and membership reporting, and audit and tax filing support. It gave Aliera control over enrolling new members. It also gave Aliera the "exclusive ownership rights to the Membership Roster," and provided that Trinity was "not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera." Aliera was granted authority in its sole discretion to "substitute any component of a Plan." In other words, Trinity was just a front.

32. The payment scheme under the 2018 Agreement was especially prejudicial to the members. The Agreement provided that ***all member "contributions" payments were to be made directly to Aliera***, which then allocated 30-40% (depending on the plan) of every payment to commissions, and also provided that Aliera would be paid substantial additional administrative fees. Only a small fraction of the amount of a member contribution (only about 16% of the amount paid under most of the plans) was actually to be placed into a Trinity "Sharebox" account for payment of claims. By contrast, under the ACA, health insurers may not spend more than 20% of premium payments on administrative costs, and 80% must be spent on benefits. 42 U.S.C. § 300gg-18.

33. Aliera subleased office space to Trinity, which became yet another means by which Aliera profited from member payments.

34.     Because Aliera had complete control over the Unity plans in 2018 at the time it created Trinity, it could easily recycle the marketing, enrollment, and plan materials it had created and developed for Unity by replacing Unity's name and logo with the new Trinity name and logo.

35.     Because Aliera had sole access to Unity's member list, it attempted to automatically switch members' plans from a Unity to a Trinity plan without requiring any action from the members. The court in the Georgia Lawsuit, however, entered a temporary restraining order preventing Aliera from doing so in December 2018.

36.     Aliera began selling the Trinity plans to new members in the fall of 2018. Chase Moses testified at length in the Georgia Lawsuit about his role in creating Trinity and developing all its health care plan materials. By May 2019, the injunction preventing Aliera from soliciting Unity members was lifted, and it actively solicited the Unity members whose plans it controlled to authorize transfer to Trinity plans.

37.     Aliera created online enrollment forms or applications for members to sign when they enrolled in the plans. Those forms misrepresented that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services." *Appendix 4.* In fact, up to 84% of the contributions went to administration and other costs. At no time did Aliera disclose that the amount of a member's contributions that would remain, after payment of all administrative and other costs, for deposit into the Sharebox for payment of member claims would be woefully insufficient to pay the reasonably likely amount of member claims.

38.     Aliera was the claims administrator for the plans. Providers' bills were submitted to Aliera for payment, and Aliera decided whether and when claims would be paid. When members had concerns about claims that were not paid, they called an Aliera representative.

39.     Due to the small percentage of the members' payments eventually ending up in the Sharebox for payment of claims, there were insufficient funds to pay members' claims. Aliera dealt with this problem by avoiding, delaying, or unreasonably denying payment of claims. When members complained, Aliera's practice was, *inter alia*, to make false promises of payment, demand that medical providers resubmit medical records multiple times, or advise that it would "reprocess" the requests for payment. Aliera never advised the members, however, that there were insufficient funds to pay the claims because Aliera was siphoning off as much as 84% of the members' monthly contributions for "administrative" costs.

## C.     Aliera Designs, Markets, and Sells Health Care Plans that Function as Health Insurance, and Draws Scrutiny from State Regulators

40.     Aliera designed and created the Trinity health care plans to be sold to members as "alternatives" to health insurance that mimicked traditional health insurance plans. For example:

(a)     It created "sell sheets" that laid out benefits and costs for various plans; *see, e.g., Appendix 1.* The more robust the plan and the lower the deductible (called a "Member Shared Responsibility Amount" or "MSRA"), the more a member paid. *Id*. Similarly, the cost of the plans increased as a member aged and if the member smoked. *Id*.

(b)     It advertised the plans as "great for those who simply want to have peace of mind knowing that they will be able to receive the health care services they need when they need them," or as "allow[ing] members to achieve comparable cost assurances for catastrophic health care services (including preventative care and immediate access to doctors through office visits, urgent care, and telemedicine) at a much lower cost…." *Appendix 2.*

(c)     It identified health care expenses, such as in-patient and out-patient care, prescription benefits, preventive care, specialty care and hospitalization, that would be included after the MSRA or a copay was paid. *Appendix 1.*

– 11 –

(d)     It misrepresented that payments to Aliera and its claims practices were similar to those used in health insurance by offering a standard "comparison" of the terms used by Aliera to those used in standard insurance policy. Hence, a premium was a "contribution," a deductible was a "Member Shared Responsibility Amount (MSRA)," and a co-pay was a "co-expense." *Appendix 2.*

(e)     Aliera called certain plans "Gold," "Silver," or "Bronze" plans, just as ACA-compliant health insurance plans are called. *Appendix 1, 2.*

(f)     It created benefits booklets that outlined the benefits of the plan, the exclusion from coverage (described as "limits of sharing"), and the necessity of pre-authorization for certain medical expenses. *See, e.g., Appendix 3.*

(g)     The monthly premium payments that Aliera described as "voluntary contributions" were, in fact, mandatory if a member wanted to be eligible for coverage of health care costs, just like insurance premiums.

(h)     The plans were sold by licensed insurance agents, who were offered outsized commissions for selling the Aliera/Trinity plans.

(i)     Like an insurance company, Aliera made payments for covered eligible medical expenses directly to medical providers after receiving standard health insurance claims. Members never sent payments directly to one another.

(j)     The plans promised coverage for an expansive network of "in network" providers, and Aliera represented that it was affiliated with "a growing nationwide PPO network of more than 1,000,000 health care professionals and more than 6,000 facilities." *Appendix 3,* p. 15.

41. Members received a card that mimicked a health insurance card and were advised to keep it with them at all times to present to health care providers. *Appendix 5*.

42. Aliera marketed and represented these health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM under 26 U.S.C. § 5000A(d)(2)(B)(IV) for the following reasons:

(a) Trinity was created 15 years after December 31, 1999 and, at the time of its creation in 2018, had no members. Under the federal statute, an entity or a predecessor of the entity must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV). Trinity did not have members who had shared medical expenses "continuously and without interruption since at least December 31, 1999." Nor did Trinity have any predecessor entity. The application form submitted to the IRS by Aliera's attorney checked "No" to the question, "[a]re you a successor to another organization?"

(b) In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs…." 26 U.S.C. § 5000A(d)(2)(B)(III). Although Trinity's original bylaws, attached to its application to the IRS for recognition as a 501((3) entity, set forth a specific set of Protestant Christian religious beliefs, Trinity never restricted its membership to those individuals who affirmed specific common beliefs. Members were only asked to affirm a generic "Statement of Beliefs" that refers to no particular religion. *See Appendix 4*. As stated in "frequently asked questions" on Trinity's website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare

program operates." *Appendix 2*, p. 12. As a practical matter, the generic Statement of Beliefs allowed sale of the health care products to the general public.

(c)     Although a CPA firm prepared an independent auditors' report of Trinity's finances for the six months it was in existence in the last half of 2018, it later withdrew that report. Trinity never subsequently completed a financial audit, as required by the statute.

43.     Aliera further misrepresented to members that Trinity was "recognized" as a qualified HCSM. It was, in fact, impossible for Trinity to have been "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was created. Trinity has never appeared on any list of recognized HCSMs developed by the U.S. Department of Health and Human Services.

44.     The Trinity health care plans Aliera created and sold prompted increasing complaints from consumers and attracted scrutiny from state regulators:

(a)     As early as April 8, 2019, the State of Washington's Office of the Insurance Commissioner issued a final investigative report concluding that Trinity was not a valid HCSM and was acting as an unauthorized insurer in Washington. That Insurance Commissioner entered a Cease and Desist Order against Trinity and Aliera on May 13, 2019.

(b)     On June 13, 2019, the State of Texas filed suit against Aliera alleging that it was selling unauthorized insurance products in that state and seeking to enjoin its sale of those products in Texas.

(c)     Multiple other states have followed, including California, Colorado, Connecticut, District of Columbia, Iowa, Maryland, Michigan, New York, New Hampshire, New Jersey, New Mexico, Oregon, and Pennsylvania, all generally concluding that the plans were unauthorized insurance.

45.     Several civil lawsuits were filed against Aliera claiming the health care plans sold through Trinity were unauthorized insurance, including:

(a)     *Jackson, et al., v. The Aliera Companies, Inc., Aliera Healthcare Inc., Trinity Healthshare Inc.,* No. 2:19-cv-1281 (J. Rothstein, W.D. Wash.);

(b)     *Duncan v. The Aliera Companies, Inc., Trinity Healthshare Inc., OneShare Health LLC,* No. 2:20-cv-867-TLM-KJM (J. Nunley, E.D. Cal.);

(c)     *Kelly, et al. v. The Aliera Companies, Inc, Trinity Healthshare Inc.,* No. 3:20-cv-05038-MDH (J. Harpool, W.D. Mo.);

(d)     *Smith, et al., v. The Aliera Companies, Inc., Trinity Healthshare Inc, OneShare Health LLC,* No. 1:20-cv-02130-RBJ (J. Jackson, D. Colo.); and

(e)     *Albina, et al. v. The Aliera Companies, Inc. Trinity Healthshare Inc., OneShare Health LLC,* No. 5:20-cv-496-JMH (J. Hood, E.D. Ky.).

46.     Aliera claimed in these proceedings that the Trinity HCSM plans were not insurance because neither Aliera nor Trinity had any obligation to indemnify the members for medical claims out of their own money, and instead, all medical expenses were to be "shared" from the members' funds. Nevertheless, it was Aliera who determined which part of the members' payments would be siphoned off to pay itself and which part would be placed in a fund to pay the expenses.

47.     To prolong the scheme, Aliera delayed resolution of the substantive issues in the lawsuits by claiming that an arbitration clause in the back of the Trinity member guides required a multi-step dispute resolution process culminating in binding arbitration in Georgia. Even after courts found the arbitration clauses unenforceable, Aliera appealed the decisions to further delay substantive judicial scrutiny of its illegal practices.

**D.      Aliera Restructures Itself to Mask Its Control of Trinity but Maintains Control Over Trinity and Continues to Misrepresent the Plans it Sold**

48.      Despite the cascade of regulatory actions and lawsuits against it, Aliera continued to aggressively sell the Trinity plans. In addition, Aliera reacted by attempting to superficially distance itself from Trinity while still controlling Trinity. Its protestations to courts and regulators that it was merely an administrator for Sharity, however, were misleading.

49.      After the first regulatory actions were begun, the Aliera principals hand-picked another person to become a Trinity insider. Chase Moses, Timothy Moses, and William Thead met William Guarino at an insurance legislators conference in June 2019. They recruited him to serve as Trinity's president, only its second employee, and as a third board member.

50.      Aliera created four subsidiary entities — Defendants Ensurian, Advevo, Tactic Edge, and USA Benefits — and changed its name from Aliera Healthcare, Inc. to The Aliera Companies, Inc. in 2019. Aliera divided the various tasks it was performing directly under the 2018 Agreement among these four Subsidiaries. All four Subsidiaries had their principal places of business at 990 Hammond Drive, Atlanta, Georgia, which was also Aliera's principal place of business.

51.      William Thead signed, on behalf of Trinity, five agreements with the new Aliera Subsidiaries, all effective January 1, 2020 ("Subsidiary Agreements"). These Subsidiary Agreements divided the tasks delegated to Aliera in the 2018 Agreement as follows: (1) Ensurian, which had obtained a license as an insurance agency, was granted the exclusive right to market and sell the Trinity health care plans. Trinity granted Ensurian the non-assignable right to purchase Trinity's membership list in the event there was a change in the majority of the Trinity board of directors. (2) USA Benefits was to administer all claims, prepare and send member cards and other materials that were provided to members, provide explanations of benefits to members and

providers, maintain a process for receipt of member complaints, handle accounting, and furnish Trinity with information it needed to prepare its annual audit and Form 990 tax returns. (3) Tactic Edge developed and owned the software and IT platform and maintained the databases of member enrollment and payments. Under this agreement, it "licensed" access to its system to Trinity. (4) Under an "Ancillary Agreement" with Tactic Edge, that entity would handle customer complaints and would provide coordination and communication with regulators. (5) Advevo was to provide marketing and brand development services.

52.    A fee schedule was attached to each of these Subsidiary Agreements that allowed the Subsidiaries to be paid an amount from each member's monthly premium payment, with the amount dependent on the amount of the member's payments, such that the larger the member's monthly payment, the larger the fee paid to the Aliera Subsidiary. The members' payments continued to go directly to Aliera or a Subsidiary, and the fees were deducted before any of the members' payments were deposited into Trinity's Sharebox account for payment of claims. Under these contracts, the Aliera Subsidiaries paid themselves 58-60% of the members' payments.

53.    From the time Trinity was created until early 2021, Aliera had sole control over all payments made by members, of the costs deducted from the payments, of the amounts deposited into the Sharity account for payment of medical claims, and of the amount paid out of the Sharebox account for members' medical expenses.

54.    Aliera and its Subsidiaries rebranded the member materials, including sell sheets, member guides, enrollment forms, member cards, web portals, and explanations of benefits, to remove its own name and replace it with the Trinity or, after Trinity changed its name, the Sharity name. The materials nevertheless were all created by Aliera or one of its Subsidiaries. The administration of all member claims and handling of member complaints continued to be by

employees of Aliera or one of its Subsidiaries, even though telephone calls and emails would be from accounts nominally in the Trinity/Sharity name. Emails sent to members under the "Trinity" or "Sharity" name were in fact sent by Aliera or one of its Subsidiaries. Newsletters sent to members under the Trintiy name were created and sent by an Aliera Subsidiary.

55.     By the time Sharity filed its bankruptcy petition, Aliera had enrolled over 66,000 members[2] in the Sharity health care plans.

56.     Although members paid approximately **$363,000,000** in monthly member fees and application fees for their Trinity health care plans, Trinity never had more than three employees.

**E.     Aliera Created Trinity Knowing that It Could Not Pay the Health Care Expenses of Members and that It Would Fail**

57.     Aliera created the Trinity health care plans and determined the amount of monthly payments members would pay under each plan. It set the prices at rates that were substantially less than traditional ACA-compliant health insurance plans in order to make the plans appear attractive to purchasers, while advertising the plans as providing comparable benefits to those health insurance plans.

58.     Aliera's goal was to continually enroll as many members as possible in order to generate as much monthly revenue as possible. Although the enrollment forms Aliera created asked potential members whether they had any medical issues, upon information and belief, it had the policy of not denying membership to anyone who applied.

59.     At the time Sharity filed its petition for bankruptcy, Aliera or its Subsidiaries were retaining up to 60% of the member fees. Sharity also received approximately 10% of member payments to cover expenses, consisting primarily of defense in lawsuits and regulatory actions. As

---

[2] There were 66,255 unique households that purchased Sharity health care plans. Many plans also had dependents in addition to the primary member enrolled in the plan, such that a total of 159,307 individuals were enrolled in the plans.

a result, only about 30% of the member payments were actually deposited into Sharity's Sharebox account for payment of claims.

60.     Health insurers are required to pay at least 80% of premiums received on member claims for ACA-compliant plans under federal law, 42 U.S.C. § 300gg-18. Aliera had the ratio upside down, setting aside at most 30% of member premiums for payment of claims.

61.     To the extent there were any independent directors or officers of Aliera, they would have had an early warning of Trinity's inevitable demise when it received an independent auditors' report regarding Trinity's financial statements for the period June 27 – December 31, 2018, the first six months of Trinity's existence. In that report, the auditors raised "substantial doubt about [Trinity's] ability to continue as a going concern." The report noted that expenses would exceed revenues for the year ending December 31, 2019, as well. Although the federal statute requires HCSMs to conduct an annual audit made available to the public under 26 U.S.C. § 5000A(d)(2)(B)(V), no further audits were conducted of Trinity's finances. This 2018 audit was eventually retracted by the auditors, as well.

62.     Aliera, its officers and directors, and other insiders never advised members that Sharity would be unable to pay all medical claims but instead continued to collect member payments and sell new plans.

63.     Even though the amount remaining for deposit into Sharity's Sharebox account, after payment of Aliera's and its Subsidiaries' fees, was woefully inadequate to pay members' medical claims, Aliera maintained its scheme to defraud members by continuing to aggressively sell the plans to new members, thus generating larger revenue, while at the same time continuing to arbitrarily deny or delay payment of claims. At the time Sharity filed its petition for bankruptcy, Sharity members learned for the first time from Aliera that there were claims totaling over

$50 million from members that had been approved for payment but had not yet been paid. That figure, however, revealed only a small part of the problem, because it did not include claims that had been submitted but were not yet approved or that had been arbitrarily denied. When those medical claims are added in, the total amount of the gross unpaid claims is at least $317,923,820. Meanwhile, at the time of Sharity's bankruptcy filing, Sharity held only approximately $1.2 million in its Sharebox account for payment of the members' medical claims.

64.     Like all Ponzi schemes in which payments to earlier victims are paid from funds collected from newer victims, Aliera's scheme eventually failed. Sharity filed its petition for bankruptcy, and thousands of members were left without health insurance and with huge unpaid medical bills. Many members are now being pursued by their health care providers for the unpaid bills.

65.     A judgment was entered against Aliera on November 11, 2021, in *Jackson, et al. v. The Aliera Companies, Inc., et al*., Case No. 2:19-cv-01281-BJR, in the U.S. District Court for the Western District of Washington, in favor of a plaintiff class, for $20,646,077.08, and in favor of the individual named plaintiffs in the aggregate amount of $22,631, plus exemplary damages in the amount of $706,750. In entering the judgment, the court expressly found that Aliera had designed, marketed, and sold unauthorized and illegal health insurance, violated Washington's Consumer Protection Act, and that the plaintiffs had suffered damages as a result of illegal and fraudulent practices. *Appendix 6.* The court orally opined that Aliera violated state insurance regulations:

> by illegally selling health insurance, and by failing to make payments as promised, to the individuals; and, in fact, siphoning off money from … the individuals, so that there are no funds now … to repay the class members for the money that has been taken from them. Aliera has misused that money and has defrauded these individuals.

*Appendix 7.* A judgment was entered against Aliera on November 17, 2021, in *Albina, et al. v. The Aliera Companies, et al.*, Case No. 5:20-CV-00496-JMH, in favor of one of the named plaintiffs in the amount $16,255.54 and in favor of the class in the amount of $4,679,868.46. In entering the judgment, that court expressly found that "Aliera misled the class members into entering into contracts for a product that was not what it purported to be and did not comply with applicable federal or state law." *Appendix 8.*

## V.    CAUSES OF ACTION

### A.  First Cause of Action – Avoidance of Fraudulent Obligations and Transfers Under 11 U.S.C. §548

66.    Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65, *above*.

67.    Sharity incurred obligations arising from or under the Aliera Contracts, and Sharity incurred obligations arising from or under the Subsidiary Agreements on January 1, 2020, less than two years before Sharity filed its petition in this bankruptcy.

68.    Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, were incurred with the actual intent to hinder, delay, and/or defraud one or more entities to which Sharity was or became, on or after the date that the obligations were incurred, indebted, including Sharity's members. These obligations are voidable under 11 U.S.C. § 548(a)(1)(A).

69.    The transfers that were actually or purportedly made on account of Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, were made with the actual intent to hinder, delay, and/or defraud one or more entities to which Sharity was or became, on or after the date that the transfers were made, indebted, including Sharity's members. These transfers are voidable under 11 U.S.C. § 548(a)(1)(A).

70.     Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, were incurred, and all transfers that were actually or purportedly made on account of those obligations were made, with the actual intent to hinder and delay payment of the medical expenses of Sharity's members by knowingly underfunding the Sharebox account from which those members' medical expenses would be paid. These obligations and transfers are voidable under 11 U.S.C. § 548(a)(1)(A).

71.     Sharity paid up to 60% of the members' contributions to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements, which grossly exceeded the fair market value of the services received in exchange for the payment. Under federal law, administrative expenses of the type Aliera and its Subsidiaries provided cannot exceed 20% of insureds' premium payments. The overpayment is, or the overpayments are, voidable under 11 U.S.C. § 548(a)(1)(B) because:

(a)     As a result of the exorbitant fees Aliera and its Subsidiaries skimmed off the members' fees, Sharity was left insolvent without sufficient funds to pay members' claims. 11 U.S.C. § 548(a)(1)(B)(ii)(I).

(b)     Aliera and its Subsidiaries retained for themselves these exorbitant fees knowing that Sharity would be left with insufficient funds to pay the claims of its members. 11 U.S.C. § 548(a)(1)(B)(ii)(III).

(c)     Aliera was a person in control of Sharity and is a Sharity insider under 11 U.S.C. § 101(31)(B)(iii), and the obligations incurred under the Aliera Contracts, including the Subsidiary Agreements, were to an insider. 11 U.S.C. § 548(a)(1)(B)(ii)(IV).

72.     Before deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, conducted

reasonable due diligence, given the case's circumstances, on Sharity's causes of action arising from or under 11 U.S.C. § 548.

73.     When deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, took into account the known and/or reasonably knowable affirmative defenses of Aliera and its Subsidiaries under 11 U.S.C. § 548.

74.     Under 11 U.S.C. § 548(a), Plaintiff is entitled to the avoidance of, and the Court must enter a judgment or other order avoiding, Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, all the transfers that were actually or purportedly made on account of those obligations, and one or more overpayments that were made to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements.[3]

## B.     Second Cause of Action – Avoidance of Fraudulent and Otherwise Voidable Obligations and Transfers under 11 U.S.C. § 544(b)(1)

75.     Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

76.     Sharity incurred obligations under the Aliera Contracts, including the Subsidiary Agreements.

77.     Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, were incurred with the actual intent to hinder, delay, and/or defraud the

---

[3] Plaintiff reserves the right to amend this Complaint to include a cause of action to avoid the entirety of any transfer that was made on account of Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, as constructively fraudulent under 11 U.S.C. § 548. The entirety of such a transfer is voidable, and Aliera and its Subsidiaries do not have an effective defense against avoidance unless the transfer was taken in good faith. Plaintiff believes that Aliera and its Subsidiaries took every transfer without good faith or in bad faith; however, for now, by this Complaint, Plaintiff only seeks the avoidance of the overpayments as constructively fraudulent under 11 U.S.C. § 548.

entities to which Sharity was or became, on or after the date that the obligations were incurred, indebted, including Sharity's members. These obligations are voidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

78.    The transfers that were actually or purportedly made on account of Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, were made with the actual intent to hinder, delay, and/or defraud one or more entities to which Sharity was or became, on or after the date that such transfer was made, indebted, including Sharity's members. These transfers are voidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

79.    Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, were incurred, and all transfers that were actually or purportedly made on account of those obligations, were made with the actual intent to hinder and delay payment of the medical expenses of Sharity's members by knowingly underfunding the Sharebox account from which those members' medical expenses would be paid. These obligations and transfers are voidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

80.    Sharity paid up to 60% of the members' contributions to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements, which grossly exceeded the fair market value of the services received in exchange for the payment. Under federal law, administrative expenses of the type Aliera and its Subsidiaries provided cannot exceed 20% of insureds' premiums payments. The overpayment is, or the overpayments are, voidable under

applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e) because:

(a)    Sharity did not receive a reasonably equivalent value in exchange for the one or more overpayments that Sharity made to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements, and one or more of the following were true:

(i)    Sharity was engaged or was about to engage in a business or a transaction for which the remaining assets of Sharity were unreasonably small in relation to the business or transaction, or

(ii)    Sharity intended to incur, or believed or reasonably should have believed that Sharity would incur, debts beyond Sharity's ability to pay as they became due.

(b)    the one or more overpayments that were made to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements, were made without Sharity receiving a reasonably equivalent value in exchange for those one or more overpayments, and Sharity was insolvent at that time or became insolvent as a result of those one or more overpayments.

(c)    the one or more overpayments that were made to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements, were made to an insider for an antecedent debt; Sharity was insolvent at that time; and Aliera and its Subsidiaries had reasonable cause to believe that Sharity was insolvent.

81.    Before deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, conducted

reasonable due diligence, given the case's circumstances, on Sharity's causes of action arising from or under 11 U.S.C. § 544(b)(1) and applicable non-bankruptcy law.

82.     When deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, took into account the known and/or reasonably knowable affirmative defenses of Aliera and its Subsidiaries under applicable non-bankruptcy law.

83.     Under 11 U.S.C. § 544(b)(1), Plaintiff is entitled to the avoidance of, and the Court must enter a judgment or other order avoiding, Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, all the transfers that were actually or purportedly made on account of those obligations, and one or more overpayments that were made to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements.[4]

## C.    Third Cause of Action – Avoidance of Preferences and Preferential Transfers under 11 U.S.C. § 547

84.     Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

85.     Sharity incurred obligations under the Aliera Contracts, including the Subsidiary Agreements; therefore, Aliera and its Subsidiaries were creditors of Sharity because Sharity was or is liable on any claim of theirs arising from or under the Aliera Contracts, including the Subsidiary Agreements

---

[4] Plaintiff reserves the right to amend this Complaint to include a cause of action to avoid the entirety of any transfer that was made on account of Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, as constructively fraudulent under 11 U.S.C. § 544(b)(1) and applicable non-bankruptcy law. The entirety of such a transfer is voidable, and Aliera and its Subsidiaries do not have an effective defense against avoidance unless the transfer was taken in good faith. Plaintiff believes that Aliera and its Subsidiaries took every transfer without good faith or in bad faith; however, for now, by this Complaint, Plaintiff only seeks the avoidance of the overpayments as constructively fraudulent under 11 U.S.C. § 544(b)(1) and applicable non-bankruptcy law.

86.     Further, Aliera and its Subsidiaries are insiders of Sharity.

87.     One or more transfers were made to Aliera and its Subsidiaries on account of Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements ("Targeted Transfers").

88.     Each of the Targeted Transfers was a transfer of an interest of Sharity in property.

89.     Each of the Targeted Transfers was made to or for the benefit of one or more creditors, specifically Aliera and its Subsidiaries.

90.     Each of the Targeted Transfers was made for or on account of an antecedent debt that Sharity owed (generally as a result of entering into the Aliera Contracts, including the Subsidiary Agreements) before the specific Targeted Transfer was made.

91.     Each of the Targeted Transfers were made within one year before the date on which Sharity filed the petition commencing its case under the Bankruptcy Code.

92.     Each of the Targeted Transfers enabled Aliera and/or one or more of its Subsidiaries to receive more than it or they would receive if

(a)     Sharity's bankruptcy case was a case under Chapter 7 of the Bankruptcy Code,

(b)     the specific Targeted Transfer had not been made, and

(c)     Aliera and/or one or more of its Subsidiaries received payment of their claims to the extent provided by the Bankruptcy Code's provisions.

93.     Before deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, conducted reasonable due diligence, given the case's circumstances, on Sharity's causes of action arising from or under 11 U.S.C. § 547.

94.     When deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, took into account the known and/or reasonably knowable affirmative defenses of Aliera and its Subsidiaries under 11 U.S.C. § 547(c).

95.     Under 11 U.S.C. § 547(b), Plaintiff is entitled to the avoidance of, and the Court must enter a judgment or other order avoiding, all the Targeted Transfers.[5]

**D.      Fourth Cause of Action – Recovery of Fraudulent or Otherwise Voidable Transfers or the Value Thereof under 11 U.S.C. § 550**

96.     Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

97.     Each of the defendants is the initial transferee of each of the following, or an entity for whose benefit each of the following was made, or an immediate or mediate transferee of the initial transferee receiving each of the following:

(a)     the voidable transfers that were made on account of Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, and

(b)     the one or more voidable overpayments that Sharity made to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements.

98.     Before deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, conducted reasonable due diligence, given the case's circumstances, on Sharity's causes of action arising from or under 11 U.S.C. § 550.

---

[5] This cause of action is, to some degree, pled in the alternative. There is no antecedent debt if Sharity's obligations arising from or under the Sharity Contracts, including the Subsidiary Agreements, are avoided.

99.     When deciding to commence this adversary proceeding, Plaintiff, on behalf of Sharity, in its capacity as the debtor in possession in its case under the Bankruptcy Code, took into account the known and/or reasonably knowable affirmative defenses of Aliera and its Subsidiaries under 11 U.S.C. § 550.

100.     Under 11 U.S.C. § 550(a), Plaintiff is entitled to recover, and the Court must enter a judgment or other order awarding to Plaintiff, for the benefit of Sharity's estate, the value of each of the voidable transfers and overpayments that Plaintiff made to Aliera and its Subsidiaries under the Aliera Contracts, including the Subsidiary Agreements, plus interest thereon to the date of payment and the costs of this action.[6]

101.     That is, Plaintiff is entitled to recover from Aliera and its Subsidiaries, among other related amounts, the difference between the 20% of member payments they would have been paid had the obligations been at fair market value and the amount actually paid to Aliera and the Subsidiaries.

## E.     Fifth Cause of Action – Fraud and Misrepresentation

102.     Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

103.     Plaintiff asserts this claim derivatively on behalf of Sharity as the entity with associational standing to assert the collective claims of its members.

---

[6] Plaintiff reserves the right to amend this Complaint to include a cause of action to recover on account of the entirety of any transfer that was actually or purportedly made on account of Sharity's obligations arising from or under the Aliera Contracts, including the Subsidiary Agreements, and is voidable as constructively fraudulent under 11 U.S.C. § 548 or under 11 U.S.C. § 544(b)(1) and applicable non-bankruptcy law. The entirety of such a transfer is voidable, and Aliera and its Subsidiaries do not have an effective defense against recovery unless the transfer was taken in good faith. Plaintiff believes that Aliera and its Subsidiaries took every transfer without good faith or in bad faith; however, for now, by this Complaint, Plaintiff only seeks recovery on account of the voidable overpayments, rather than the entirety of the voidable transfers.

104.    Aliera represented to its members:

(a)    ***That no more than 40% of their contributions would be used for overhead and administrative expenses.*** This representation was false. Under the 2018 Agreement, as much as 85% of a members' payment went to administrative and overhead expenses, leaving only approximately 15% to cover medical expenses. Under the Subsidiary Agreements, 60% of the member payments went to the Aliera Subsidiaries, another 10% went to Trinity overhead, and only 30% of members' payments was used to cover medical expenses. The misrepresentation was material. If members had known the majority of their payments would be used to pay Aliera rather than medical claims, they would not have purchased the health care plan.

(b)    ***That Trinity/Sharity was a legitimate HCSM.*** This representation was false. Aliera knew that Trinity/Sharity could never qualify as an HCSM because Aliera did not create it until July 2018. The HCSM statute is clear:  to be a legitimate HCSM, the nonprofit entity must have existed continuously while sharing health care expenses among members since 1999. The representation was material. By falsely cloaking the health care plan in a disguise of a Christian ministry and a religious organization, Aliera persuaded members that they should purchase the plan because it would be operated in a legitimate, moral, and trustworthy fashion.

(c)    ***That health care needs would be covered on levels comparable to those of traditional health insurers.*** This representation was false. In fact, Aliera knew that, after it paid itself and its Subsidiaries exorbitant fees, there would be insufficient funds remaining to pay the reasonably foreseeable health care needs of the members. This representation was also material. Members purchased the health care plans so that their medical bills would be paid. They would not have purchased the plans if they had known that they might be stuck with tens or even hundreds of thousands of dollars in unpaid medical expenses.

105.    As a result of these misrepresentations, the members purchased what turned out to be worthless health coverage. They spent a total of $362,799,502 in monthly premiums and upfront fees that they would not have paid had they known that Trinity was a sham, that Aliera would siphon off the majority of their premium payments, and that their medical bills would not be paid.

F.    **Sixth Cause of Action – Breach of Fiduciary Duty**

106.    Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

107.    Plaintiff asserts this claim derivatively on behalf of Sharity and on behalf of Sharity as the entity with associational standing to assert the collective claims of its members.

108.    Aliera and its principals created and controlled Sharity through much of its existence. For example, Aliera continued to control Sharity's cash until at least early 2021. It was a Sharity insider.

109.    As a Sharity insider, Aliera owed a fiduciary duty to Sharity, a nonprofit entity, and to its members.

110.    Aliera breached its fiduciary duty by, among other things:

(a)    Inducing Sharity to enter into the 2018 Agreement that provided only 15% of members' payments would be set aside for payment of medical claims;

(b)    Inducing Sharity to enter into the Subsidiary Agreements that provided up to 60% of member payments would be paid to the Aliera Subsidiaries, leaving insufficient funds for payment of medical claims; and

(c)    Unfairly delaying and denying the payment of member claims, without advising members that the reason for the lack of payment was that there were insufficient funds to pay the claims.

111.    As a result of Aliera's breaches of fiduciary duty, Sharity had inadequate funds to pay the medical claims of members.

112.    At the time Sharity filed its petition, members collectively had at least[7] $317,923,820 in gross unpaid medical claims.

## G.    Seventh Cause of Action - Aiding and Abetting Breach of Fiduciary Duty

113.    Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

114.    Plaintiff asserts this claim derivatively on behalf of Sharity and on behalf of Sharity as the entity with associational standing to assert the collective claims of its members.

115.    Regardless of whether Aliera directly owed a fiduciary duty to Sharity or its members, it aided and abetted Sharity's board members to breach their fiduciary duty by, among other things:

(a)    Inducing Sharity's principals to enter into the 2018 Agreement that provided only 15% of members' payments would go to payment of medical claims; and

(b)    Inducing Sharity to enter into the Subsidiary Agreements that provided up to 60% of member payments would be paid to the Aliera Subsidiaries, leaving insufficient funds for payment of medical claims.

116.    As a result of Aliera's aiding and abetting of breaches of fiduciary duty, Sharity had inadequate funds to pay the medical claims of members.

117.    At the time of Sharity filed its petition, members collectively had $317,923,820 in unpaid medical claims.

---

[7] Many members incurred medical expenses shortly before the petition date. The claims for payment for those expenses had not yet been submitted at the time the petition was filed, and those payment requests are not reflected in this number. Nor does this number reflect the damage to members who forewent needed care because Aliera arbitrarily refused to "pre-authorize" it.

**H.      Eighth Cause of Action - Conversion**

118.    Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

119.    Plaintiff asserts this claim derivatively on behalf of Sharity as the entity with associational standing to assert the collective claims of its members.

120.    The members' payments were made with the intent to provide a fund from which members' medical claims would be paid. At least 80% of members' funds should have been deposited into a fund for the payment of medical claims. Aliera, exerting full control over the members' funds, converted the majority of those funds to their own use rather than depositing them into the common fund for payment of medical claims. Aliera is obligated to return all members' payments to the common fund for payment of medical expenses or the return of members' monthly payments.

**I.      Ninth Cause of Action - Unjust Enrichment**

121.    Plaintiff reasserts and incorporates its allegations set forth in paragraphs 1–65 *above*.

122.    Plaintiff asserts this claim derivatively on behalf of Sharity as the entity with associational standing to assert the collective claims of its members.

123.    By paying itself and its Subsidiaries more than 20% of the members' monthly payments, and by failing to ensure the promised coverage of medical expenses, Aliera and its Subsidiaries have been unjustly enriched.

## VI.   PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court:

(a)      Declare that:

(1)     Obligations owed and payments made to Aliera and its Subsidiaries are voidable;

(2)     the voidable payments made to Aliera and its Subsidiaries or the value of those payments are recoverable from Aliera and its Subsidiaries;

(3)     Aliera deceived the Sharity members;

(4)     Aliera and its Subsidiaries breached their fiduciary duties;

(5)     Aliera and its Subsidiaries aided and abetted the Sharity principals in breaching their fiduciary duties;

(6)     Aliera and its Subsidiaries wrongfully converted the members' contributions; and

(7)     Aliera and its Subsidiaries were unjustly enriched.

(b)     Enter judgment in Plaintiff's favor and against all Defendants, jointly and severally, in the amount of $574,736,117. That amount represents the aggregate claim — $600,100,950 — of all members against the Sharity estate if each member's claim against the Sharity estate is individually valued at the greater of either, for that member (a) the amount paid in monthly contributions and upfront fees, or (b) the amount of the members' gross unpaid medical expenses, for each Sharity member, but subtracts the amount of the judgments, totaling $25,364,833, awarded by the federal district courts in *Albina* and *Jackson*. This is the same damages award method used by the federal district courts in both of those cases.

(c)     Award reasonable attorney fees and costs, including but not limited to costs and fees associated with experts or bankruptcy counsel, to Plaintiff; and

(d)     Grant such other relief as this Court deems just and equitable.

– 34 –

Dated: November 24, 2021         Respectfully submitted,
      Wilmington, Delaware

                                 */s/ David W. Giattino*
                                   Joseph H. Huston, Jr. (No. 4035)
                                   David W. Giattino (No. 5614)
                                   **STEVENS & LEE, P.C.**
                                   919 North Market Street, Suite 1300
                                   Wilmington, Delaware 19801
                                   Tel:      (302) 425-3310 | (302) 425-2608
                                   Fax:      (610) 371-7972 | (610) 371-7988
                                   E-mail:   joseph.huston@stevenslee.com
                                                         david.giattino@stevenslee.com

                                   – and –

                                   Cyrus Mehri (admitted *pro hac vice*)
                                   **MEHRI & SKALET, PLLC**
                                   1250 Connecticut Avenue, NW, Suite 300
                                   Washington, D.C. 20036
                                   Tel:      (202) 822-5100
                                   Fax:      (202) 822-4997
                                   E-mail:   CMehri@findjustice.com

                                   – and –

                                   Eleanor Hamburger (admitted *pro hac vice*)
                                   **SIRIANNI YOUTZ SPOONEMORE HAMBURGER PLLC**
                                   3101 Western Avenue, Suite 350
                                   Seattle, Washington 98121
                                   Tel:      (206) 223-0303
                                   Fax:      (206) 223-0246
                                   E-mail:   ele@sylaw.com

                                   *Counsel to Plaintiff Official Committee of Members of Sharity Ministries, Inc.*